[No. S032832. Aug. 18, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
OMAR FUENTES MARTINEZ, Defendant and Appellant.

674

**COUNSEL**

Kathy M. Chavez, under appointment by the Supreme Court, and Tara Mulay for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood and Carlson M. LeGrand, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**CHIN, J.**—Defendant Omar Fuentes Martinez appeals from a judgment of the Riverside County Superior Court imposing the death penalty following his conviction of first degree murder (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated), conspiracy to commit murder (§ 182), attempted murder (§§ 187, 664), discharging a firearm at an inhabited dwelling (§ 246), and assault with a deadly weapon (§ 245, subd. (a)), accompanied by a prior murder special-circumstance finding (§ 190.2, subd. (a)(2)). Defendant's appeal is automatic. (§ 1239, subd. (b).)

The special circumstance finding was based on defendant's 1980 Texas murder conviction following a guilty plea. Prior to trial on the charged offenses, a hearing was held to determine whether the Texas conviction was "punishable as murder" in California, as required by section 190.2, subdivision (a)(2). Although the trial court refused to bind defendant over for trial on the prior murder special circumstance, the Court of Appeal reinstated the allegation, holding that the Texas murder conviction was for an offense that, under Texas law, included all elements of second degree murder, as defined by California law, thereby satisfying section 190.2. (*People v. Martinez* (1991) 230 Cal.App.3d 197 [281 Cal.Rptr. 205] (*Martinez*).) We unanimously denied review.

As will appear, the prior murder issue constitutes the centerpiece of defendant's appeal. We conclude that defendant's contention is barred by the doctrine of law of the case. On the merits, we further conclude that defendant's prior Texas murder conviction based on his guilty plea to unlawfully, knowingly and intentionally shooting his victim, was punishable as second degree murder under California law. As none of defendant's other contentions has merit, we will affirm the judgment in its entirety.

## I. FACTS

The present murder count was based on the 1988 murder of Victor Castillo. Castillo and Jose Manuel Meza performed casual labor for defendant, putting roofs and trusses on buildings in the Riverside area. Defendant's friend Jose Abel Camacho also worked with these men. Defendant owed back wages to Castillo, Meza and some other laborers, but when confronted by these men,

defendant showed hostility and reluctance to pay. On at least two occasions, defendant displayed firearms, including a machine gun. About a week before the murder, Raul Ibarra confronted defendant and told him to pay "all those guys" the money he owed them. Defendant pointed a firearm at Ibarra and told him to mind his own business, an act that led to a weapons assault charge against defendant. On the day before Castillo's murder, Meza filed a complaint for back wages with the Labor Commissioner.

On the evening of November 4, 1988, Castillo joined Meza, Jose Borquez, and others talking and drinking beer outside a Victoria Street home where Meza's brother lived. Defendant drove by in his blue Toyota automobile, with Camacho his passenger. Castillo approached the car, and when he was about five feet away, defendant shouted "Here you are, motherfucker," raised his AK-47 rifle, and fired at Castillo two or three times, killing him. Camacho was also armed with a rifle, but he pointed it at no one, perhaps because he had difficulty lowering the car window. After defendant drove away, the remaining men heard multiple gunshots from several blocks away.

Defendant next drove to Ibarra's home on Grove Street, where Leonardo Armenta was visiting. Armenta heard gunshots and went outside, where he saw defendant driving his blue Toyota. Someone else was with him, probably Camacho. As defendant approached the house, he raised an AK-47 rifle and commenced firing at Armenta, who ran inside. Armenta thought he could distinguish two different rifles being fired. Approximately 45 bullets were fired into the house, but no one was harmed—although one bullet missed Armenta by only a foot. This incident led to the attempted murder and firearm discharge counts against defendant.

Officers Kilmer and Lino spotted defendant's car headed away from Riverside. One taillight was out and the car was weaving from side to side. The officers ordered defendant and Camacho to stop and exit the car. Defendant was unsteady and appeared to be intoxicated. The officers hand-cuffed the men and noticed the car's left and right rear windows were shattered. They discovered loaded firearms in the car and numerous spent casings scattered throughout. The officers performed a field sobriety test on defendant and concluded he was intoxicated. The officers arrested and transported defendant and Camacho to county jail.

A follow-up investigation produced additional circumstantial evidence further linking defendant with the crimes. We will discuss additional facts of record material to specific guilt phase issues in the course of resolving those issues.

The defense attempted to cast doubt on the prosecution's version of the shootings. Witnesses Meza and Borquez, contrary to their earlier testimony,

now indicated they did not see defendant shooting at them or Castillo. The defense also called Camacho, who denied that he or defendant fired shots at anyone, contrary to his earlier testimony at his own trial that defendant had fired his rifle at the Victoria and Grove Street locations. Camacho testified that on the day of the shootings, defendant and some other men spent two hours shooting and drinking beer. Camacho indicated that they had been drinking earlier as well, and that defendant drank many more beers than the other men. Later that day, defendant drank more beer and also used cocaine and speed.

Following the guilt verdicts, the prosecution presented uncontradicted evidence on the special circumstance allegation. The jury found true the allegation that defendant, on May 16, 1980, had been convicted of the crime of murder of Antonio LeFosse, in violation of section 19.02, subdivision (a)(1), of the Texas Penal Code, a special circumstance within the meaning of California Penal Code section 190.2, subdivision (a)(2).

At the penalty phase, the People introduced the evidence underlying defendant's Texas homicide conviction. In brief, this evidence showed that defendant shot and killed cabdriver LeFosse during a fare dispute. Defendant signed a statement to Texas police indicating he shot LeFosse when the latter appeared to be reaching underneath the seat for a weapon. To shoot LeFosse, defendant admitted he first had to remove his pistol from his back pocket, pull back the slide, load a clip of bullets, extract a shell, then pull the slide forward to ensure it was ready for firing.

The People also introduced evidence of defendant's pointing a firearm at an apartment manager, Michael Pluim, in Riverside, and his possession of a homemade metal "shank" concealed in a mattress cover in his jail cell. The defense introduced evidence of defendant's Mexican background, his poverty and difficult upbringing, and his life in the United States.

On rebuttal, the prosecutor introduced evidence of defendant's disciplinary problems in a Texas prison, his transfer to a Mexican prison, and his failure to report to authorities while on limited leave from that prison.

## II. PRETRIAL ISSUES

### A. *Validity of Prior Murder Special Circumstance*

California Penal Code section 190.2, subdivision (a)(2), allows a death sentence to be imposed if "[t]he defendant was convicted previously of murder in the first or second degree . . . . [A]n offense committed in another jurisdiction, which if committed in California would be punishable as first or

second degree murder, shall be deemed murder in the first or second degree." In the present case, the prosecution introduced evidence showing that in 1980 in Texas defendant pleaded guilty to "unlawfully intentionally and knowingly causing the death of Antonio LeFosse, by shooting him with a gun." (See Tex. Pen. Code, § 19.02, subd. (b)(1).)

Prior to trial, defendant contended his Texas offense, as defined by Texas law in 1980, did not include California's requisite element of express or implied *malice*, and therefore would not have qualified as "punishable as . . . murder" in California. As noted, defendant prevailed in this argument before the trial court, but the Court of Appeal reached a contrary conclusion. (*Martinez, supra,* 230 Cal.App.3d 197.) Nonetheless, defendant reasserts the issue here. Before reaching the merits of defendant's claim, we first examine the Court of Appeal's decision and then address the Attorney General's contention that the claim is barred by the doctrine of law of the case.

### 1. *Court of Appeal Decision*

The *Martinez* court noted that the trial court's decision was based on its conclusion that Texas law failed to recognize the doctrine of imperfect self-defense announced in *People v. Flannel* (1979) 25 Cal.3d 668, 674 [160 Cal.Rptr. 84, 603 P.2d 1], a doctrine that conceivably could have reduced defendant's crime to manslaughter. (*Martinez, supra,* 230 Cal.App.3d at pp. 200–201.) In other words, the lower court relied on the possibility that defendant's Texas murder would not have been *punished* as murder at a trial held here. The Court of Appeal disagreed with that approach, finding *Flannel* irrelevant in determining whether the Texas offense was *punishable* as murder in California. (See *People v. Andrews* (1989) 49 Cal.3d 200, 222–223 [260 Cal.Rptr. 583, 776 P.2d 285] (*Andrews*).) As the Court of Appeal stated, "[w]e conclude that the magistrate and trial court, by focusing on whether Texas recognized a *Flannel* defense, were, in effect, attempting to determine whether defendant would have been *punished* for murder had he committed his offense in California. In other words, both judges apparently interpreted the phrase 'would be punishable' as requiring 'certainty of punishment' rather than 'the capacity therefor.' Under *Andrews*, the relevant inquiry is whether the offense of which the defendant was convicted in Texas *includes the elements of first or second degree murder in California* such that the Texas offense was one which had the capacity for punishment as first or second degree murder." (*Martinez, supra,* 230 Cal.App.3d at pp. 202–203, italics added.)

Turning to an analysis of the Texas and California *elements* of murder, the Court of Appeal believed that the Texas requirement that the defendant "intentionally or knowingly causes . . . death" (Tex. Pen. Code, § 19.02,

subd. (b)(1)), was the "functional equivalent" of California's requirement of an "unlawful killing . . . with malice aforethought." (Cal. Pen. Code, § 187; see *Martinez, supra,* 230 Cal.App.3d at p. 203.) The *Martinez* court concluded that defendant's Texas murder conviction included the elements of second degree murder under California law. (*Martinez, supra,* at p. 203.)

The court continued by observing that in 1974, a revision of the Texas murder statutes introduced the terms "intentionally" and "knowingly" to help simplify and clarify the various culpable mental states for various crimes. This revision suggested to the *Martinez* court that these terms "do not create previously unknown mental states, but, rather, define the traditional mens rea concept of malice in more precise and comprehensible language. In other words, what distinguishes 'murder' in California from 'murder' in Texas is terminology, not substance." (*Martinez, supra,* 230 Cal.App.3d at p. 204, fn. omitted.)

The court then examined the Texas statutes defining "intentionally" and "knowingly," concluding that they respectively embodied the California concepts of express and implied malice. (*Martinez, supra,* 230 Cal.App.3d at pp. 204–205.) Thus, under Texas Penal Code section 6.03, subdivision (a), "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." The *Martinez* court observed that an "intentional" murder under section 19.02, subdivision (a)(1), of the Texas Penal Code is one in which the defendant " 'intended to engage in the act that caused the death . . . [and] . . . also . . . specifically intended that death result from that conduct.' " (*Martinez, supra,* at p. 204; see *Morrow v. State* (Tex.Crim.App. 1988) 753 S.W.2d 372, 375–376, fn. 3.) Thus, "[i]n our view, the mental state which Texas law refers to as 'intentionally,' when applied to the Texas crime of murder, is simply another way of defining the mental state which California refers to as 'express malice,' that is, a deliberate intent to kill (§ 188)." (*Martinez, supra,* at pp. 204–205.)

Similarly, the *Martinez* court concluded that under Texas law, acting "knowingly" is equivalent to the California concept of acting with implied malice. Under Texas Penal Code section 6.03, subdivision (b), a person acts knowingly "when he is aware of the nature of his conduct or that the circumstances [surrounding his conduct] exist," and is also "aware that his conduct is reasonably certain to cause the result." The *Martinez* court, finding no precise Texas case on point, opined that "[t]he Texas mental state of 'knowingly' and the California mental state of 'implied malice' both focus on the subjective awareness, or knowledge, of the defendant. In Texas, a defendant knowingly causes the death of another, and thus commits murder, when the defendant is subjectively aware that death is 'reasonably certain to

result' from the defendant's conduct. In California, a defendant kills another human being with implied malice, and likewise commits murder, when the defendant is subjectively aware of the life-threatening risk involved in the defendant's conduct. (See *People v. Dellinger* (1989) 49 Cal.3d 1212, 1221 [264 Cal.Rptr. 841, 783 P.2d 200].) Based on the foregoing analysis, we conclude, as previously stated, that the Texas mental state of 'knowingly' includes each of the concepts embodied in the mental state of 'implied malice,' such that a 'knowing' killing in Texas is equivalent to a killing with 'implied malice' in California." (*Martinez, supra,* 230 Cal.App.3d at pp. 205–206.)

The *Martinez* court concluded that, given the equivalence of Texas and California law as pertains to the mental states needed for first and second degree murder, defendant's Texas murder conviction was properly deemed a prior offense, " 'which if committed in California would be punishable as second degree murder,' " for purposes of section 190.2, subdivision (a)(2). (*Martinez, supra,* 230 Cal.App.3d at p. 206.)

### 2. *Law of the Case*

The Attorney General argues that, under the law of the case doctrine, defendant should not be allowed to reargue the issue. The Attorney General realizes, however, that "the doctrine will not be adhered to where its application will result in an unjust decision, e.g., where there has been a 'manifest misapplication of existing principles resulting in substantial injustice' [citation], or the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations. [Citation.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 787 [42 Cal.Rptr.2d 543, 897 P.2d 481].) Although the substantive issue presented here may be complex, and the elements of murder under Texas law in 1980 somewhat unclear, we cannot say that the *Martinez* court manifestly misapplied existing law, or that intervening decisions have clarified that law since *Martinez* was decided. Accordingly, we conclude that the law of the case doctrine applies here. Nonetheless, we will explore the substantive issue in some depth to demonstrate that no manifest misapplication of law occurred here.

### 3. *Equivalence of Texas and California Elements of Murder*

Defendant argues the *Martinez* court erred in finding that his 1980 Texas plea to "unlawfully intentionally and knowingly" shooting and killing a person qualified as an offense, "which if committed in California would be punishable as first or second degree murder." (§ 190.2, subd. (a)(2).) He observes that in 1980 the Texas murder statute did not expressly require proof of malice, i.e., proof of either an unlawful intent to kill (required in California

to show express malice) or an abandoned and malignant heart (required for implied malice). (See § 188.) Instead, defendant contends a Texas defendant could be convicted of murder if he merely intentionally or knowingly committed the act causing death, whether or not his act and intent were mitigated by his voluntary intoxication, unreasonable self-defense, or other justification or excuse.

As we will explain, defendant's Texas guilty plea to *both* intentionally *and* knowingly shooting his victim eliminated any uncertainty as to whether his act qualified, at the least, as an *implied* malice murder under California law. ■ Contrary to defendant's argument, such mitigating factors as imperfect self-defense or voluntary intoxication are not elements of the offense of murder in this state. We agree with the *Martinez* court that defendant's Texas murder conviction did indeed qualify as a prior murder for purposes of California's special circumstance provision.

### a. *California Law*

■ In this state, "malice" is defined by statute as "express" if the defendant intended "unlawfully" to kill his victim, and "implied" if the killing was unprovoked or the circumstances showed "an abandoned and malignant heart." (§ 188.) Defendant finds nothing in 1980 Texas law requiring such states of mind, an argument we explore below. But the quoted portion of the California statutory definition of implied malice has given way to a definition more meaningful to juries, so that malice is now deemed implied " 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People v. Dellinger, supra,* 49 Cal.3d at p. 1217; see CALJIC No. 8.11 [defining implied malice killing]; see also *People v. Rios* (2000) 23 Cal.4th 450, 460 [97 Cal.Rptr.2d 512, 2 P.3d 1066]; *People v. Blakeley* (2000) 23 Cal.4th 82, 87–88 [96 Cal.Rptr.2d 451, 999 P.2d 675]; *People v. Whitfield* (1994) 7 Cal.4th 437, 450 [27 Cal.Rptr.2d 858, 868 P.2d 272].) Such conduct amounts to second degree murder, and for purposes of applying the *Andrews* elements test, these prerequisites are the sole elements of that offense. (See CALJIC No. 8.31.) ■ As explained below, by pleading guilty to intentionally and knowingly causing death by shooting, defendant acknowledged *at the least* committing an act meeting the foregoing California definition of *implied* malice.

Defendant observes that in California in 1980, unlike in Texas, the doctrine of imperfect self-defense allowed a defendant to negate malice by showing he was acting with an actual, though unreasonable, belief in the need to defend

himself and thus did not intend to kill unlawfully or with an abandoned and malignant heart. (E.g., *People v. Flannel, supra*, 25 Cal.3d at pp. 674–680.) Similarly, in California, unlike Texas, a defendant could present evidence of his voluntary intoxication to show he did not act with the requisite mental state for the offense of murder. (E.g., *People v. Saille* (1991) 54 Cal.3d 1103, 1115 [2 Cal.Rptr.2d 364, 820 P.2d 588]; but see § 22, subd. (b), as amended in 1995 [voluntary intoxication admissible "solely" to show whether defendant lacked specific intent or, in a murder case, whether defendant "premeditated, deliberated, or harbored *express* malice aforethought" (italics added)].) Language in *In re Christian S.* (1994) 7 Cal.4th 768, 779–780 and footnote 4 [30 Cal.Rptr.2d 33, 872 P.2d 574], suggests that a defendant may rely on the doctrine of imperfect self-defense, or voluntary intoxication, or on similar mitigating factors to defeat a claim that he acted with the *unlawful* intent required for either express *or implied* malice.

■ But the unavailability of such mitigating theories under Texas law does not defeat application of the prior murder special circumstance in this case, for those mitigating factors are not elements of the offense of murder but are defensive matters, which may reduce murder to manslaughter by negating malice. We note that, if we were to adopt defendant's position and hold that, for purposes of applying the *Andrews* "elements" test, "unlawfulness" or "unlawful intent" is an additional California element of murder lacking in Texas law, our holding effectively could disqualify *all* out-of-state murders for the prior murder special circumstance. Although given the opportunity to file supplemental authorities, appellate counsel has cited no other state that makes "unlawfulness" an essential element of the crime of second degree murder.

Thus, the absence of imperfect self-defense or voluntary intoxication is not an *element* of the offense of murder to be proved by the People. Instead, these doctrines are "mitigating circumstances," which may reduce murder to manslaughter by negating malice. (E.g., *People v. Rios, supra*, 23 Cal.4th at p. 461, and cases cited.) The defendant is obliged to "proffer some showing on these issues sufficient to raise a reasonable doubt of his guilt of murder." (*Id.* at pp. 461–462.) The problem with defendant's analysis is that it merely shows that it was *conceivable* he could have mounted a defense of voluntary intoxication, imperfect self-defense, or other mitigating circumstance, had he been tried in California rather than Texas, and had he chosen to defend rather than plead guilty. But because of his guilty plea, we have no way of knowing whether a successful defense to murder could have been raised.

As we stated in *Andrews, supra*, 49 Cal.3d at page 222, "[d]efendant is attempting to characterize the words 'would be punishable' as if they were synonymous with the term 'would be punished.' 'Punishable' has been

defined as '[d]eserving of or capable or liable to punishment; capable of being punished by law or right.' (Black's Law Dict. (5th ed. 1979) p. 1110, col. 1.) The word does not denote certainty of punishment, but only the capacity therefor . . . . [¶] To accept defendant's statutory construction would mean that every time the prosecution alleged a murder conviction from a foreign jurisdiction, the trial court must determine whether the guilt ascertainment procedures of that jurisdiction afforded the same procedural protections as those in California. We do not read such a requirement into the statute." We further stated in *Andrews* that the intent underlying section 190.2, subdivision (a)(2), was to limit the use of foreign convictions to those that "include all the elements of the offense of murder in California . . . ." (*Andrews, supra,* at p. 223; see also *People v. Trevino* (2001) 26 Cal.4th 237, 242–244 [109 Cal.Rptr.2d 567, 27 P.3d 283].)

We concluded in *Andrews* that because it would have been "*possible* for [the defendant] to have been convicted of murder" in this state, the offense was "punishable" here. (*Andrews, supra,* 49 Cal.3d at p. 223, italics added.) As will appear, by pleading guilty to unlawfully, intentionally, and knowingly shooting and killing someone, defendant in the present case admitted committing an act that had the *capacity* of being punished as murder in this state. In *Andrews*'s words, it was entirely "possible" to have convicted defendant of second degree murder in California. (*Ibid.*)

### b.  *Texas Law*

Did defendant's Texas murder include all the elements of a California murder, as required by *Andrews*? According to the Attorney General, and supported by *Martinez, supra,* 230 Cal.App.3d at pages 205–206, in 1974, before defendant committed his Texas murder, Texas substantially adopted the Model Penal Code to simplify the criminal statutes *without changing the substantive law*, by discarding former references to mens rea and malice, and substituting language defining murder as "intentionally or knowingly caus[ing] the death of an individual." (Tex. Pen. Code, § 19.02, subd. (b)(1); see Tex. Pen. Code, § 6.03, subds. (a), (b) [defining these mental states].) Indeed, the framers of the Model Penal Code stated that "[m]urder is defined in Section 210.2 to include cases where a criminal homicide is committed purposely, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life," and opined that these "concepts provide a more satisfactory means of stating the culpability required for murder than did the older language of 'malice aforethought' and its derivatives." (Model Pen. Code & Commentaries, com. to § 210, p. 2; see also *id.,* pp. 13–19.)

But we have found no decisions squarely equating the Texas murder statute's reference to intentionally or knowingly causing death with the

California concepts of express or implied malice. The Attorney General cites Texas cases supposedly so holding, but as defendant observes, they fail to go that far. (See *Dowden v. State* (Tex.Crim.App. 1988) 758 S.W.2d 264, 276 [dissent noted equivalence of California's requirement of malice and Texas's requisite "intent to kill"]; *Durrough v. State* (Tex.Crim.App. 1981) 620 S.W.2d 134, 138 [former Texas concept of malice "necessarily includes" intentional conduct required under 1974 amendment]; *Luck v. State* (Tex.Crim.App. 1979) 588 S.W.2d 371, 374 [Texas court's post-1974 reference to concept of murder with malice].)

On the other hand, defendant fails to cite Texas authorities holding that the 1974 adoption of the Model Penal Code definitions for the requisite mental states for murder necessarily abandoned the concepts of express or implied malice and created *lesser* standards in their place. Nor does he cite any Texas case in which a defendant was actually convicted of murder without requiring at least the equivalent of a conscious indifference to life. (See *Cook v. State* (Tex.Crim.App. 1994) 884 S.W.2d 485, 489–491 [Texas murder statute must be interpreted as requiring either intent or knowledge that the act will or may cause death]; *Morrow v. State* (Tex.Crim.App. 1988) 753 S.W.2d 372, 375–376, fn. 3 ["intentional[]" murder under the Texas murder statute is one in which the defendant *both* intended to engage in the act that caused the death and also specifically intended that death result from that conduct]; *Beggs v. State* (Tex.Crim.App. 1980) 597 S.W.2d 375, 377 [Texas murder statute focuses on the *result* of one's conduct, not merely its nature]; cf. *Holmes v. State* (Tex.App. 1992) 830 S.W.2d 263, 266 ["intentional[]" murder under Texas statute can include either an actual intent to kill or a conscious desire to commit the act causing death].)

Because Texas case law does not definitively settle the point, we look to the bare language of the Texas statutes. As noted, defendant pleaded guilty to the Texas offense of unlawfully intentionally and knowingly causing the death of his victim by shooting him. Thus, by his plea he admitted that he had the "conscious objective or desire" either to shoot or to kill. (Tex. Pen. Code, § 6.03, subd. (a) [defining "intentionally"].) Similarly, by acknowledging that he knowingly caused a death, his plea admitted he was "aware that his conduct [was] reasonably certain to cause" death. (Tex. Pen. Code, § 6.03, subd. (b) [defining "knowingly"].) Consciously intending to shoot or kill someone, with knowledge that death is reasonably certain to occur, seems an *even more culpable act* than merely shooting someone with a conscious disregard for his life, an act that would be sufficient to constitute implied malice in California. (*People v. Rios, supra,* 23 Cal.4th at p. 460.)

As noted, Texas Penal Code section 6.03, subdivision (b), states that a person acts "knowingly" with respect to the nature of his conduct or the

surrounding circumstances "when he is aware of the nature of his conduct or that the circumstances [surrounding his conduct] exist." The section continues, however, by stating that one acts knowingly "with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." (*Ibid.*) Defendant claims that under Texas Penal Code section 6.03, subdivision (b), he could have been convicted of murder if he simply was aware of the nature or circumstances surrounding his conduct. But he cites no cases so holding, and the last sentence of the subdivision seemingly also requires knowledge that death is reasonably certain to result from defendant's conduct. In other words, by admitting he knowingly caused a death, he admitted he was aware death was reasonably certain to occur.

In short, although Texas case law in 1980 may have been unclear as to whether a murder conviction could be based entirely on the defendant's intent to commit the act causing death, as opposed to an actual intent to kill, defendant's guilty plea included, and possibly exceeded, all the elements required by California law to constitute implied malice and second degree murder. That being so, the *Martinez* decision should be deemed law of the case, as that case involved no " 'manifest misapplication of existing principles,' " and no post-*Martinez* decisions have intervened to cast doubt on its holding. (*People v. Stanley, supra,* 10 Cal.4th at p. 787.)

Our conclusion makes it unnecessary to reach the Attorney General's alternative argument that we properly may consider the facts and circumstances underlying the offense to which defendant pleaded guilty, facts that in this case were elicited during the penalty phase. (See *People v. Trevino, supra,* 26 Cal.4th at p. 241 [inquiring whether "conduct" of the offender satisfied all elements of California law]; *Andrews, supra,* 49 Cal.3d at p. 223 [inquiring whether prior offense included "all the elements of the offense of murder in California"]; cf. *People v. Guerrero* (1988) 44 Cal.3d 343, 345 [243 Cal.Rptr. 688, 748 P.2d 1150] [allowing reference to "entire record" in determining whether prior offense was "serious felony" for purposes of sentence enhancement].) Contrary to defendant's contention, our reliance on the wording of the Texas indictment to determine what crime defendant committed would not constitute improper consideration of extraneous "facts and circumstances underlying the offense." In order to apply the "elements" test of *Andrews, supra,* 49 Cal.3d at pages 222–223, we certainly must know, at the least, the crime to which defendant pleaded guilty.

B. *Statements of Prospective Juror Paul N.*

During voir dire, and in the presence of 10 of the 12 jurors who ultimately were selected for defendant's trial, the prosecutor questioned Prospective Juror Paul N. about the alcohol and drug rehabilitation facility he managed.

Mr. N. described himself as a recovering substance abuser who had been in continual contact with alcoholics and drug addicts during his 11-year tenure, and claimed he had treated nearly 500 clients, approximately 120 successfully.

Mr. N. agreed, without defense objection, that "in general" his clients "when they are intoxicated, realize what's going on." Over a subsequent defense objection that the prosecutor was making Mr. N. his "expert witness," Mr. N. was also permitted to confirm that people with alcohol problems sometimes "make excuses for themselves," by thinking "they are going to do one thing and yet end[ing] up doing another" and "go[ing] back to drinking."

Defendant now characterizes Mr. N.'s testimony as saying that persons such as defendant with alcohol problems "can and do plan their actions, although they may not always follow through to carry out their plans. He thus expressed an opinion as an 'expert' on a principal issue in [defendant's] case, i.e., whether [defendant] committed a planned intentional killing" despite his claimed intoxication. In defendant's view, the trial court should have conducted further voir dire to determine whether the panel had become "infected" by Mr. N.'s statements. Defendant claims the error violated his Sixth and Fourteenth Amendment rights to confrontation and an impartial jury. (See *Mach v. Stewart* (9th Cir. 1998) 137 F.3d 630, 633 [prospective juror in sex abuse case claimed expertise in the area and stated she had never seen a case in which the child victim's abuse claims ultimately were not borne out].)

Contrary to defendant's characterization, a fair reading of the record discloses that Mr. N.'s comments primarily concerned a substance abuser's tendency to "backslide" despite his good intentions, and not to his ability to plan or premeditate a crime while intoxicated. Although Mr. N. also agreed that generally intoxicated persons "realize what's going on," defendant failed to object to the prosecutor's question or defendant's response, which in any event was too broad and indefinite to be viewed as referring to defendant's ability to plan or premeditate a crime. Accordingly, we find no error in failing to conduct additional voir dire. That being so, we need not pass on the Attorney General's arguments that defendant waived the claim of error by (1) failing to request further voir dire questions or move to quash the venire, and (2) failing to exhaust his peremptory challenges.

## III.   GUILT PHASE ISSUES

### A.   *Court's Explanations and Instructions to the Jury*

Defendant argues the trial court violated his Sixth and Fourteenth Amendment rights to due process and a fair trial by giving the jury explanations and

instructions which unduly favored the prosecution. Defendant complains that the court erred by telling the jury (1) Armenta did not testify because he could not be located, (2) the prosecutor was not to blame for the loss of certain missing physical evidence, and (3) defendant Martinez was also known as Jose Serrano Reyna. As will appear, defendant failed to make proper objection to, or request clarification of, these various statements. Moreover, whether viewed separately or together, these matters were far too minor to constitute prejudicial error. (See *People v. Hedgecock* (1990) 51 Cal.3d 395, 407 [272 Cal.Rptr. 803, 795 P.2d 1260 [due process violation for court to remove element of offense from jury's consideration]; *People v. Santana* (2000) 80 Cal.App.4th 1194, 1207 [96 Cal.Rptr.2d 158].)

### 1. *Armenta's Absence*

Although Armenta testified for the People at defendant's preliminary examination, he returned to Mexico before trial and could neither be compelled to appear nor located despite the prosecutor's reasonable diligence to find him. Accordingly, the People moved to introduce Armenta's earlier preliminary examination testimony. Before admitting it, the court, without defense objection, explained to the jury that Armenta was unavailable to testify because he could not be located.

Defendant now asserts the court's explanation was "false" in that the true reason Armenta was unavailable was because he was in Mexico beyond the court's process and refused to voluntarily testify for the People. Defendant points to testimony elicited at a preliminary hearing held on the question of the prosecutor's due diligence and showing that at one point the People were able to contact Armenta by phone but he refused to return to testify. Defendant asserts that the court's assertedly false statement as to the inability to locate Armenta impermissibly bolstered the credibility of Armenta's preliminary hearing testimony.

The Attorney General notes that the court's explanation was fully supported by a later federal Justice Department letter to the effect that Armenta indeed could not be located. In any event, we fail to see how the court's explanation to the jury could possibly bear on or enhance the credibility of Armenta's preliminary hearing testimony. If defendant believed otherwise, he should have objected and proposed a correction or clarification. Clearly, he waived the point by not objecting on this ground. (E.g., *People v. Hawkins* (1995) 10 Cal.4th 920, 945 [42 Cal.Rptr.2d 636, 897 P.2d 574].)

### 2. *Missing Evidence*

Evidently, the prosecutor misplaced an envelope containing some glass fragments found at the Grove Street crime scene. This evidence had been

admitted at Camacho's separate trial, but could not be located by the time defendant was tried. Rather than rule evidence of these fragments inadmissible as defendant requested, the court instead explained to the jury that, following an officer's testimony regarding the fragments found on Grove Street, an envelope containing some fragments was "lost," possibly by the court clerk. Although defendant had earlier argued against admitting any evidence of these fragments, he failed to object to the court's explanation to the jury, and likewise sought no clarification.

Defendant now argues the court's foregoing explanatory statement was factually inaccurate, in that the prosecutor must be charged with misplacing the envelope, there being no evidence that court personnel were responsible. Defendant asserts the court's inaccurate statement "impermissibly bolstered the prosecution's credibility, relieved the prosecution of any need to explain why it could not show the jury pieces of physical evidence," and thereby violated defendant's constitutional rights. Defendant does not explain the significance of the missing evidence to the defense, and we fail to see how the court's explanation to the jury could possibly bear on or enhance the prosecution's credibility. Again, if defendant believed otherwise, he should have objected and proposed a correction or clarification. Clearly, he waived the point by not objecting.

### 3. *Defendant's Use of an Alias*

The trial evidence showed that defendant often identified himself as Jose Serrano Reyna. He used that alias when he purchased the gun used to shoot victim Castillo as well as during other gun purchases, and he identified himself by that name to various officers and other persons. Defendant complains that "whatever factual dispute might have existed" on the alias issue was "obliterated" by the court's frequent recitation, both in reading the information to the jury, and in the verdict forms themselves, that defendant Omar Fuentes Martinez was "also known as Jose Serrano Reyna."

The Attorney General contends that because defendant never objected to these frequent recitations, he thereby waived the point. Although defendant argues that objections to instructions and verdict forms were unnecessary (see § 1259), he points to no contested issue whatever regarding his using an alias—the record indicates the evidence was uncontradicted on the matter. We see no prejudicial error in the court's recitations.

### B. *Victim Photographs*

Defendant next asserts that his constitutional rights to due process and a fair trial were violated by the admission at the guilt phase of (1) two live

photographs of victim Castillo and some of his relatives, and (2) two autopsy photographs, one depicting Castillo's face, and one his chest area surgically opened with a probe inserted to show the bullet's trajectory.

### 1. *Live Photographs*

The court permitted the prosecutor to admit two photographs of victim Castillo with some relatives. Defendant asserts these photographs were irrelevant, could only have worked to unduly prejudice defendant, and hence were inadmissible. (See, e.g., *People v. Osband* (1996) 13 Cal.4th 622, 677 [55 Cal.Rptr.2d 26, 919 P.2d 640].) ■ The Attorney General observes, however, that the prosecutor used the photographs for identification purposes while examining five different witnesses, and also to identify Castillo as the subject in the autopsy photographs. Our cases have permitted similar uses of photographs of victims while alive. (*Ibid.*; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1230 [9 Cal.Rptr.2d 628, 831 P.2d 1210].) We find no error in admitting these photographs.

### 2. *Autopsy Photographs*

The court also permitted the prosecutor to admit two autopsy photographs of victim Castillo. One photograph shows Castillo's face with one eye partially open, and was admitted for purposes of identification and comparison with the live photographs. The other photograph displays Castillo's chest area only, with a probe inserted to demonstrate the probable trajectory of the bullet. As the Attorney General argues, the facial photograph was used for a proper purpose, was neither gory nor gruesome, and could not have prejudiced the defense. As for the chest photograph, its value in demonstrating the bullet's trajectory was debatable but not wholly lacking. Although other less graphic photographs may have been more useful in this regard, we find no abuse of the trial court's discretionary decision to admit the one at issue despite its unpleasant nature.

Our decision in *People v. Scheid* (1997) 16 Cal.4th 1 [65 Cal.Rptr.2d 348, 939 P.2d 748] is instructive. ■ There, in resolving a similar claim, we observed that the court's decision to admit victim photographs is a discretionary matter that we will not disturb on appeal unless the prejudicial effect of the photographs clearly outweighs their probative value. (*Id.* at p. 18; see Evid. Code, § 352.) We also noted that murder victim photographs need not be rejected merely because they are cumulative to other evidence in the case. (*Scheid, supra*, at p. 19.)

In the present case, we have examined the autopsy photographs in question, and although unpleasant to view, they are not unduly gruesome or

inflammatory and, as previously noted, both bear some relevance to issues in the case. All photographs of murder victims are disturbing (*People v. Scheid, supra*, 16 Cal.4th at p. 19), yet the photographs in question are no more graphic or gruesome than those we have encountered in other cases. (See, e.g., *People v. Turner* (1984) 37 Cal.3d 302, 320–321 & fn. 9 [208 Cal.Rptr. 196, 690 P.2d 669].) In sum, the trial court could properly decide, in its discretion, to admit these photographs as having probative value outweighing their potentially prejudicial effect.

## IV. PENALTY PHASE ISSUES

### A. *Victim Photographs*

Echoing his guilt phase argument, defendant asserts his constitutional rights to due process and a fair trial were violated by the admission at the penalty phase of the previously described photographs of victim Castillo and various relatives. Defendant argues the photographs were irrelevant to the penalty determination, being insufficient standing alone to show any impact on the victim's family. (See *People v. Edwards* (1991) 54 Cal.3d 787, 832–836 [1 Cal.Rptr.2d 696, 819 P.2d 436].) But as we have noted, these photographs were properly admitted at the guilt phase and, accordingly, were properly considered at the penalty phase as well. (*People v. Cooper* (1991) 53 Cal.3d 771, 821 [281 Cal.Rptr. 90, 809 P.2d 865].) Moreover, no reasonable possibility of prejudice arose from the admission of these quite ordinary family photographs.

### B. *Aggravating Evidence*

#### 1. *Evidence of Defendant's Possession of a Shank*

Defendant next argues his constitutional rights were violated by admitting, pursuant to section 190.3, factor (b), evidence that he possessed a shank in his jail cell. The record shows that an inspection of defendant's cell revealed a shank or sharpened piece of metal concealed inside the mattress cover on defendant's bed. Defendant unsuccessfully objected to the admission of this evidence on the ground that possessing a shank did not amount to prior criminal activity involving an implied threat of force or violence. (See *ibid.*) He renews his argument here.

Defendant acknowledges that we have often held that possession of weapons while incarcerated satisfies the statutory requirement of an implied threat. (E.g., *People v. Smithey* (1999) 20 Cal.4th 936, 1002–1003 [86 Cal.Rptr.2d 243, 978 P.2d 1171], and cases cited; *People v. Ramirez* (1990)

50 Cal.3d 1158, 1186–1187 [270 Cal.Rptr. 286, 791 P.2d 965].) But he asks that we reconsider our decisions, arguing that no " 'implied threat' can exist unless the defendant has committed an act or spoken words directed at an individual or group of persons *who can infer that the defendant has made a threat*. In other words, the term 'implied threat' necessarily connotes some form of communication . . . ." ▇ The argument is meritless, for section 190.3, factor (b), by its terms applies to either "express or implied" threats, and a communicated threat would constitute an *express* one. As we have held, mere possession of a potentially dangerous weapon in custody " 'involves an implied threat of violence even where there is no evidence defendant used or displayed it in a provocative or threatening manner.' [Citation.]" (*Smithey, supra*, at p. 1002, quoting from an earlier case.)

Defendant also doubts the reliability of the evidence regarding his possession of the shank. He observes that no direct evidence was admitted that he made the shank, put it in his mattress cover, or ever used it. ▇ But the record did show that for the six preceding months, defendant was the sole occupant of the cell, that jail staff frequently inspected for contraband such as shanks, and that such inspections routinely included mattresses and their covers. The shank had been placed in the four-inch-thick mattress cover near its top, and thus located beneath defendant's head as he reclined. We think such circumstantial evidence was sufficient to demonstrate defendant's possession.

## 2. *Rebuttal Evidence of Shooting at Texas Apartment*

Defendant asserts the court erred in admitting, at the penalty phase, rebuttal character evidence to the effect that, in 1978, 15 years before the charged offense, defendant and an unidentified man had an armed confrontation outside a Texas apartment. Defendant's half brother, Evarardo Aviles, testified that he heard defendant yelling at and arguing with the other man, who was armed and was interested in seeing Aviles's girlfriend, Andaverde. Aviles knew that defendant was also usually armed with a small pistol. Being afraid for his safety, Aviles went inside his apartment and later heard shots being fired from two different weapons, but evidently no one was hit. Although he never saw who fired the guns, Aviles assumed that defendant and the other man had exchanged shots. Over defense objection based on the unreliability of this evidence, the trial court admitted it after holding a foundational hearing (Evid. Code, § 402) and ruling that, although the evidence would not qualify as aggravating evidence under Penal Code section 190.3, factor (b), it could be used to rebut defense testimony regarding defendant's good character and peaceful nature.

We agree with defendant that the court erred in admitting this evidence, although the error was harmless. Although the prosecutor was entitled to

rebut the defense's mitigating evidence that defendant was a peaceful person with evidence relating to that character trait (see, e.g., *People v. Rodriguez* (1986) 42 Cal.3d 730, 791 [230 Cal.Rptr. 667, 726 P.2d 113] [prosecutor allowed to present more "balanced picture" of the defendant's personality]), Aviles's inconclusive and speculative testimony was wholly insufficient for this purpose. Without Aviles's knowing the circumstances surrounding the shooting incident, or even whether defendant participated in the shooting, his evidence was essentially valueless and should have been excluded. But as the Attorney General observes, any error was harmless in light of the inconclusive nature of the evidence and the weight of the other aggravating circumstances in the case, including the charged offense and the prior Texas murder. (Cf. *People v. Pinholster* (1992) 1 Cal.4th 865, 962 [4 Cal.Rptr.2d 765, 824 P.2d 571] [admission of irrelevant aggravating evidence rarely reversible error]; *People v. Wright* (1990) 52 Cal.3d 367, 426–427 [276 Cal.Rptr. 731, 802 P.2d 221] [same].)

### 3. *Evidence of Defendant's Parole Violation*

Defendant next argues the court erred in allowing the prosecutor to admit evidence showing that, by taking a job in Houston, Texas, defendant failed to comply with the conditions of his parole from a Mexican prison. The defense had elicited testimony from defendant's wife, Maria Bautista, to the effect that he was released from prison "because his conduct was good." Bautista also testified she was unaware that defendant's trip to the United States was a violation of his parole, or that he was required to spend weekends in the nearest Mexican jail. On cross-examination, the prosecutor showed Bautista a document she had signed requiring defendant to report any address change that could interfere with the prison's surveillance over him. The prosecutor also called a Mexican prison director, Miguel Castro, who confirmed that defendant was released from prison on condition he report to the nearest Mexican jail for incarceration on weekends. According to Castro, persons not complying were subject to arrest and returned to prison. Defendant violated his parole by failing to appear for incarceration for 66 weekends.

Defendant argues the court erred in admitting the terms and circumstances of his release from the Mexican prison. In defendant's view, impeaching Bautista and admitting Castro's testimony was improper because the matter of defendant's release was wholly collateral to the penalty determination. The Attorney General responds that the foregoing evidence was appropriate to rebut the inference, arising from Bautista's direct testimony, that defendant was a well-behaved prisoner who complied with the conditions of his release. Although the challenged evidence was only marginally relevant to the penalty issue, we find no abuse of the court's broad discretion to permit such cross-examination or rebuttal. (See *People v. Rodriguez, supra,* 42 Cal.3d at

p. 791.) In any event, any error in admitting evidence of defendant's parole violation was harmless in light of the other aggravating circumstances in the case. (See, e.g., *People v. Kaurish* (1990) 52 Cal.3d 648, 702 [276 Cal.Rptr. 788, 802 P.2d 278] [probation violation evidence harmless]; *People v. Wright, supra,* 52 Cal.3d at pp. 427–429.)

### 4. *Evidence of Defendant's Conduct in Texas Prison*

Defendant next complains of testimony by a Texas correctional officer, Raymond Sandoval, that he lost confidence in defendant as a result of two incidents which resulted in defendant's being given the lowest of three prisoner classifications. In one incident, defendant was involved in a nonviolent sit-down strike in the prison gym. The other incident arose when defendant was found in an unauthorized area where some inmates went to obtain bakery yeast to make alcoholic beverages. Sandoval admitted he knew of no other negative information regarding defendant and he thought defendant was a quiet person.

Following a foundational hearing (Evid. Code, § 402), the trial court admitted Sandoval's testimony to rebut defendant's own good character evidence, which included family testimony regarding his trustworthiness and reliability, and Bautista's testimony that defendant was released from Mexican prison due to his good conduct. Although defendant contends otherwise, we see no abuse of discretion in admitting Sandoval's testimony. In any event, in light of the remaining aggravating evidence in the case, Sandoval's testimony regarding defendant's relatively minor infractions could not have affected the jury's penalty verdict. (See, e.g., *People v. Silva* (1988) 45 Cal.3d 604, 636 [247 Cal.Rptr. 573, 754 P.2d 1070] [evidence of defendant's threat to kill guards deemed harmless].)

### 5. *Evidence of Defendant's Relationship with Yvonne Eder*

Defendant asserts the court erred in eliciting irrelevant evidence regarding his relationship with Yvonne Eder. Eder testified at the guilt phase regarding a prior offense in June 1988 when she was riding with defendant (known to her as Joe Reyna) and he was stopped by police who seized an automatic rifle from his car. On cross-examination, and over defendant's irrelevancy objection, the court itself elicited the fact that Eder was defendant's "girlfriend." Neither court nor counsel asked further questions regarding the nature of the relationship. During penalty phase oral argument, the prosecutor asked rhetorically, and without defense objection, "What was [defendant] doing while his wife and children were at home in Chino? He was dating Yvonne Eder."

Defendant now claims the "girlfriend" evidence was irrelevant and prejudicial, indicating to the jury that defendant had a girlfriend while married. But

the subject of Eder's relationship with defendant was relevant to explain her presence in the car when the gun was seized, to assist in establishing defendant's identity as Joe or Jose Reyna, and to aid the jury in evaluating Eder's testimony. In any event, in light of the other aggravating evidence in the case, any error in admitting Eder's unelaborated guilt phase statement was undoubtedly harmless to the defense.

### 6. *Cumulative Effect of Errors*

Although defendant contends the cumulative effect of the foregoing asserted evidentiary errors warrants reversal, as we have seen only one error occurred (admitting evidence regarding possible shooting at Texas apartment), and it was clearly harmless. (*Ante,* at p. 694.)

### C. *Instruction on Assault with a Deadly Weapon and Weapon Possession in Jail*

Defendant contends the court erred in instructing the jury, pursuant to CALJIC No. 8.87, that evidence had been introduced to show defendant committed murder, assault with a firearm, and possession of a weapon in jail, which offenses "involve the express or implied use of force or violence or the threat of force or violence" under Texas Penal Code section 19.03. With respect to the instruction's reference to assault with a firearm, defendant assumes it refers to the inconclusive evidence of his possible involvement in a 1978 shooting at a Texas apartment, an incident we agree did not qualify as aggravating evidence. (*Ante,* at pp. 694–695.) But as the Attorney General points out, the instruction was an appropriate reference to defendant's 1988 armed assault on apartment owner Pluim. Because the instruction further required the jury to find each aggravating offense occurred beyond a reasonable doubt before considering it, it is inconceivable the jury counted the 1978 Texas apartment incident as a significant aggravating factor, or that the instruction affected the verdict.

Defendant also complains of the instruction's reference to his possible weapon possession in jail because no evidence was admitted showing he actually or impliedly threatened anyone. But as we previously observed (*ante,* at p. 694), mere possession of a potentially dangerous weapon in custody involves an implied threat of violence under Texas Penal Code section 19.03. The instruction properly submitted defendant's weapon possession to the jury as a possible aggravating factor.

### D. *Response to Jury Inquiry Regarding Commutation*

Defendant asserts the court erred in responding to a jury inquiry regarding the finality of a life without parole sentence. We find no error.

The jury was instructed, pursuant to CALJIC Nos. 8.84 and 8.88, that the penalty for defendant shall be death or life imprisonment without possibility of parole. During its penalty deliberations, the jury sent a note inquiring whether defendant could be "exchanged with Mexico like last time" and whether "there is any way he can get out, if life without parole." Outside the jury's presence, counsel agreed the jury could be told that an exchange with Mexico was impossible, that the commutation power applies to both life without parole and death sentences, and that the jury should not consider commutation in determining the appropriate sentence. The court indicated to counsel it would tell the jury that in its experience commutation of a life without parole sentence would not occur.

Thereafter, the court advised the jury that no exchange with Mexico would be possible, that the Governor could commute either sentence, but that the jury should not consider such speculative matters in deciding penalty. The court also commented that in its experience commutation "has never happened, nor do I, as a trial judge expect it to ever happen." A juror then asked if "that is the only circumstance that would permit that?" and the court replied that barring a "cataclysmic earthquake" destroying all prisons, commutation was the only "legal way" and with the Governor a "politically elected official," it would not happen in the near future. The court repeated that the jurors should approach their deliberations as if the choice were between death and life without possibility of parole "for sure," and without considering the possibility of commutation in deciding penalty.

Defendant made no objection to the court's explanatory response to the jury's questions and, accordingly waived his present argument. (See, e.g., *People v. Hart* (1999) 20 Cal.4th 546, 656 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Carpenter* (1997) 15 Cal.4th 312, 360 [63 Cal.Rptr.2d 1, 935 P.2d 708].) In any event, his points lack merit. ■ Defendant first argues that the court misadvised the jurors regarding the ease with which a Governor could commute a life without parole sentence, failing to tell them that, by reason of defendant's prior record, no commutation would be possible without the agreement of four Supreme Court justices. (Cal. Const., art. V, § 8.) Yet our cases require no such detailed advice regarding judicial limitations on the Governor's commutation power. (*Hart, supra,* at pp. 655–656, and cases cited; but see *Coleman v. Calderon* (9th Cir. 2000) 210 F.3d 1047, 1051.)

Our review of the court's comments indicates it adequately explained the theoretical possibility of the commutation of a death or life-without-parole sentence, and cautioned the jurors not to consider the matter. (See *People v. Hovey* (1988) 44 Cal.3d 543, 584 [244 Cal.Rptr. 121, 749 P.2d 776]; *People v. Ramos* (1984) 37 Cal.3d 136, 159, fn. 12 [207 Cal.Rptr. 800, 689 P.2d

430].) As we recently explained, and contrary to defendant's assertion, nothing in *Kelly v. South Carolina* (2002) 534 U.S. 246 [151 L.Ed.2d 670, 122 S.Ct. 726], or *Shafer v. South Carolina* (2001) 532 U.S. 36 [149 L.Ed.2d 178, 121 S.Ct. 1263], suggests the court's instructions and explanations were inadequate. In those cases, unlike here, the court failed to tell jurors that the defendant would be ineligible for parole. (See *People v. Smith* (2003) 30 Cal.4th 581, 636 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Prieto* (2003) 30 Cal.4th 226, 270 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Snow* (2003) 30 Cal.4th 43, 123, 124 [132 Cal.Rptr.2d 271, 65 P.3d 749].) Our cases hold that CALJIC Nos. 8.84 and 8.88, unlike the instructions given in *Shafer* or *Kelly*, adequately inform the jury of the defendant's ineligibility for parole. (*Prieto, supra,* at pp. 270–271; *People v. Smithey, supra,* 20 Cal.4th at p. 1009.)

Defendant also faults the court for suggesting the present Governor, or a successor, might be swayed politically to *release* a prisoner. Of course, nothing in the court's remarks did any such thing. In context, the court was proposing the opposite thesis, namely, that political considerations made it highly unlikely a commutation would ever occur. (See *People v. Box* (2000) 23 Cal.4th 1153, 1198 [99 Cal.Rptr.2d 69, 5 P.3d 130].) In any event, as noted, defense counsel acceded to the court's explanatory statement and thus waived any objection for appeal.

Defendant argues the court's explanatory statement, by inaccurately suggesting the Governor could unilaterally commute a death sentence and might do so for political reasons, thus degraded the jury's relative importance in the sentencing process and diminished the jurors' sense of responsibility. (See *Caldwell v. Mississippi* (1985) 472 U.S. 320, 328–329 [86 L.Ed.2d 231, 105 S.Ct. 2633].) ■ After reading the court's entire statement in context, we find no reasonable possibility that any such degrading or diminishing occurred here. (See *People v. Hines* (1997) 15 Cal.4th 997, 1072–1074 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People v. Fierro* (1991) 1 Cal.4th 173, 244–248 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) As previously noted, the court's explanation did *not* posit the possibility of a politically engendered commutation. Instead, the court made it clear that commutation was an unlikely event, and carefully and repeatedly told the jury not to consider the possibility of commutation in determining the appropriate penalty. Defendant's reliance on *Shafer v. South Carolina, supra,* 532 U.S. 36, is misplaced. In *Shafer*, the trial court had merely instructed that life imprisonment "means until the death of the defendant," and failed to clarify that parole was unavailable to the defendant. The *Shafer* court therefore deemed inadequate the trial court's subsequent admonishment not to "consider[]" the availability of parole. (*Id.* at p. 38.)

Finally, defendant argues the court's statement improperly told the jurors defendant could be released from prison by an earthquake if he were sentenced to life without parole. In defendant's view, the court's remarks "invited the jury to speculate about the possibility" of an earthquake big enough to free him from confinement. ■■ Although the court may have erred in mentioning the speculative possibility of an earthquake causing defendant's release, the error was harmless and could not possibly have affected the verdict. (See *People v. Hill* (1992) 3 Cal.4th 959, 1009–1011 [13 Cal.Rptr.2d 475, 839 P.2d 984] [prosecutor's reference to an earthquake or other "miracles" deemed harmless error].) Despite defendant's present concern, it is highly unlikely any juror chose death for him because of a concern that a "cataclysmic earthquake" might some day set him free. In any event, as noted, defense counsel acceded to the court's explanatory statement, including the earthquake reference, and thus waived any objection for appeal.

### E. *Miscellaneous Instructional Omissions*

Defendant asserts the court erred, and violated his state and federal constitutional rights, in failing to instruct the jurors they must find, beyond a reasonable doubt, that (1) the aggravating circumstances were true, (2) they were so substantial as to outweigh the mitigating circumstances and justify a death verdict, and (3) death was the appropriate penalty. Defendant also complains of the court's failure to require jury unanimity regarding the applicable aggravating circumstances. We have recently and repeatedly rejected all these contentions. (See, e.g., *People v. Hughes* (2002) 27 Cal.4th 287, 404–406 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Weaver* (2001) 26 Cal.4th 876, 991–993 [111 Cal.Rptr.2d 2, 29 P.3d 103]; *People v. Carpenter, supra,* 15 Cal.4th at pp. 417–421; *People v. Bradford* (1997) 14 Cal.4th 1005, 1057–1059 [60 Cal.Rptr.2d 225, 929 P.2d 544].) We see no good reason to reexamine those cases.

Defendant cites *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], as justifying reconsideration of the foregoing decisions. These cases, however, have no application to the penalty phase procedures of this state. (*People v. Prieto, supra,* 30 Cal.4th at pp. 262–264; see *People v. Smith, supra,* 30 Cal.4th at p. 642; *People v. Snow, supra,* 30 Cal.4th at p. 126, fn. 32].)

In *Apprendi*, the United States Supreme Court found a constitutional requirement that any *fact,* other than a prior conviction, which increases the maximum penalty for a crime must be formally charged, submitted to the fact finder, treated as a criminal element, and proved beyond a reasonable doubt. (*Apprendi v. New Jersey, supra,* 530 U.S. at pp. 476–490.) ■■ We see

nothing in *Apprendi* that would require specific findings regarding the truth of the aggravating circumstances, their relative weight, or the appropriateness of a death penalty. (See also *Ring v. Arizona, supra,* 536 U.S. at p. 602 [requiring jury finding beyond reasonable doubt as to *facts* essential to punishment]; *People v. Anderson* (2001) 25 Cal.4th 543, 589–590, fn. 14 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

Defendant asserts the court erred in failing to require the jury to submit a statement of reasons supporting its death verdict. We have repeatedly held otherwise. (E.g., *People v. Diaz* (1992) 3 Cal.4th 495, 571–572 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; *People v. Frierson* (1979) 25 Cal.3d 142, 179 [158 Cal.Rptr. 281, 599 P.2d 587].)

■ Defendant contends the court should have instructed the jury that evidence of defendant's background could only be considered as mitigating evidence. We have rejected the contention that the instructions should identify the various aggravating and mitigating evidence. (E.g., *People v. Lewis* (2001) 26 Cal.4th 334, 395 [110 Cal.Rptr.2d 272, 28 P.3d 34]; *People v. Box, supra,* 23 Cal.4th at p. 1217; *People v. Medina* (1990) 51 Cal.3d 870, 909 [274 Cal.Rptr. 849, 799 P.2d 1282].) Defendant cites *People v. Hardy* (1992) 2 Cal.4th 86 [5 Cal.Rptr.2d 796, 825 P.2d 781] to support his theory the court erred in failing to instruct that evidence of a defendant's background can only be mitigating unless it falls under one of the permissible aggravating factors listed in section 190.3. But *Hardy* found it unnecessary to reach the question whether such an instruction was required, holding instead that no prejudicial error occurred, because no reasonable possibility existed that the jury improperly considered any of the defendant's background evidence as aggravating. (*Hardy, supra,* at pp. 207–208.) We reach the same conclusion here. Defendant points to a portion of the prosecutor's closing argument in which he attempted to rationalize or justify the severe punishment defendant's father inflicted on him on one occasion. Nothing in the argument, however, told the jury to deem defendant's background evidence an aggravating factor to be counted against him.

F. *Automatic Motion to Modify*

Defendant next contends the court relied on inadmissible or irrelevant evidence in denying his motion to modify sentence (§ 190.4). As the Attorney General observes, however, defendant made no contemporaneous objection to the ruling and, accordingly, waived the point for appeal. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1220 [96 Cal.Rptr.2d 1, 998 P.2d 969].) In any event, the point lacks merit.

Defendant's motion to modify emphasized such mitigating factors as his level of intoxication during his various offenses, his disadvantaged childhood,

his current family relationship, and his ability to serve a life sentence without committing further acts of violence. The court, in its statement of reasons denying modification, cited as aggravating factors the circumstances of the charged crimes, the prior Texas murder special circumstance, and defendant's apparent custom of driving around with automatic weapons. The court acknowledged defendant's troubled background and found it was unfortunate but not a sufficient justification or excuse for murder, while defendant's current family relationship was "moderated" by his apparent infidelity, and defendant also apparently "cheat[ed] his employees."

As for defendant's intoxication, the court faulted defendant for persisting in drinking after he had "gotten into trouble previously on it." The court also doubted defendant was as intoxicated as he claimed, noting that his intoxication did not prevent him from picking an appropriate victim, expressing ill will toward him, and then shooting that victim in a surprise attack.

Defendant first argues the court improperly relied on his intoxication as an aggravating factor. (Cf. *People v. Hardy, supra,* 2 Cal.4th at p. 207 [jury should not deem defendant's proffered background or character evidence aggravating].) But the record fails to support the claim. Rather than treat defendant's intoxication as an aggravating factor, the court merely explained why it did not consider this evidence to be sufficiently mitigating when balanced with the aggravating evidence. No error occurred here. (See, e.g., *People v. Scott* (1997) 15 Cal.4th 1188, 1222 [65 Cal.Rptr.2d 240, 939 P.2d 354], and cases cited; *People v. Siripongs* (1988) 45 Cal.3d 548, 585 [247 Cal.Rptr. 729, 754 P.2d 1306].)

Defendant also faults the court for considering defendant's possible marital infidelity as an aggravating factor. But again, the court's remarks indicate it simply felt the evidence that defendant had a "girlfriend" while still married diminished the mitigating force of his background and family evidence, and especially his wife's testimony that he was a good father and always treated her well. In any event, assuming error occurred, no reasonable possibility exists that the court's consideration of defendant's possible marital infidelity affected its ruling. As the court's statement of reasons makes clear, its decision was founded on the other, more substantial aggravating circumstances in the case. (See *People v. Avena* (1996) 13 Cal.4th 394, 448 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *People v. Whitt* (1990) 51 Cal.3d 620, 660–661 [274 Cal.Rptr. 252, 798 P.2d 849].)

Defendant contends that the court erred in assuming that his troubled background was not relevant to justify or excuse his offenses and therefore constituted an aggravating factor. (See *People v. Davenport* (1985) 41 Cal.3d 247, 288–290 [221 Cal.Rptr. 794, 710 P.2d 861].) To the contrary, we find

nothing in the record indicating the court treated defendant's background evidence as aggravating or as wholly irrelevant to the penalty determination. The court merely acknowledged that although defendant's "background of deprivation" was a mitigating factor, it could not serve to excuse defendant's "ten-year history" of violence. (See, e.g., *People v. Scott, supra,* 15 Cal.4th at p. 1222.) As *Scott* explains, the court was entitled to evaluate the weight of defendant's mitigating evidence in determining whether to grant or deny his modification motion.

### G.  *Constitutionality of Death Penalty Statute*

Defendant asserts that this state's death penalty statute is unconstitutional in various respects, by (1) failing to rationally narrow the class of death-eligible defendants; (2) allowing the prosecutor unfettered discretion to charge a murder case as a capital offense; (3) failing to provide meaningful intercase or intracase proportionality review; and (4) requiring certain sentencing factors to be extreme or substantial in order to have mitigating effect. We have recently and repeatedly rejected these arguments, and defendant gives us no good reason to reconsider these authorities. (See, e.g., *People v. Weaver, supra,* 26 Cal.4th at pp. 989–992; *People v. Ochoa* (2001) 26 Cal.4th 398, 458–459, 462 [110 Cal.Rptr.2d 324, 28 P.3d 78]; *People v. Box, supra,* 23 Cal.4th at p. 1217; *People v. Crittenden* (1994) 9 Cal.4th 83, 152–158 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

### H.  *Asserted Violation of International Law*

Defendant argues that imposing the death sentence on him, a citizen of Mexico, would violate international law and treaties and would require his death sentence be vacated. Defendant's premise is that, by reason of the various trial errors supposedly committed in his case, he was denied due process and a fair trial as guaranteed by international law. But as we have seen, no significant errors occurred here. Defendant also asserts that international law guarantees him the right to be free of racial discrimination, and that "various studies" show the death penalty is imposed in a racially discriminatory manner, but he alleges no facts of record indicating that any such discrimination occurred in his case.

In any event, we have repeatedly rejected similar arguments based on international law, and defendant gives us no good reason to reconsider these authorities. (See *People v. Ochoa, supra,* 26 Cal.4th at p. 462; *People v. Jenkins* (2000) 22 Cal.4th 900, 1055 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Ghent* (1987) 43 Cal.3d 739, 778–779 [239 Cal.Rptr. 82, 739 P.2d 1250].)

### I. *Lethal Injection*

Defendant contends that death by lethal injection is cruel and unusual punishment. Again, we have recently and repeatedly rejected these arguments, and defendant gives us no good reason to reconsider these authorities. (See, e.g., *People v. Ochoa, supra,* 26 Cal.4th at p. 464; *People v. Samayoa* (1997) 15 Cal.4th 795, 864 [64 Cal.Rptr.2d 400, 938 P.2d 2]; *People v. Holt* (1997) 15 Cal.4th 619, 702 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

### J. *Correcting Abstract of Record*

Defendant observes that the abstract of judgment incorrectly recites that defendant was sentenced to "life without the possibility of parole" for the premeditated and deliberate attempted murder charged in count four. In fact, as the Attorney General acknowledges, the actual sentence was one of life *with* possibility of parole for this offense. We will order the judgment corrected. (See *People v. Scott* (1994) 9 Cal.4th 331, 354 [36 Cal.Rptr.2d 627, 885 P.2d 1040].)

### K. *Cumulative Effect of Errors*

Defendant asserts that the cumulative effect of the various evidentiary and instructional errors in this case requires reversal of the judgment, but as we have seen, no serious errors occurred that, whether viewed individually or in combination, could possibly have affected the jury's verdict.

## V. CONCLUSION

The judgment, as corrected (see pt. IV. J., *ante*), is affirmed.

George, C. J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I concur in affirming the judgment as to guilt. I dissent, however, from the affirmance of the special circumstance finding and the sentence of death. The special circumstance finding is invalid because it is based on a prior murder conviction in another jurisdiction that does not include all the elements of murder under California law. The sentence of death is invalid because it is based on the invalid special circumstance finding.

Under California's death penalty law, capital punishment may be imposed for the crime of first degree murder only if that crime was committed with one or more of the special circumstances listed in Penal Code section 190.2,

subdivision (a). Here, the information alleged and the jury found only one special circumstance, that defendant "was convicted previously of murder in the first or second degree" (Pen. Code, § 190.2, subd. (a)(2)). For purposes of this special circumstance, "an offense committed in another jurisdiction, which if committed in California would be punishable as first or second degree murder, shall be deemed murder in the first or second degree." (*Ibid.*) As this court has explained, this provision limits qualifying foreign convictions to those that "include all the elements of the offense of murder in California." (*People v. Andrews* (1989) 49 Cal.3d 200, 223 [260 Cal.Rptr. 583, 776 P.2d 285]; accord, *People v. Trevino* (2001) 26 Cal.4th 237, 244 [109 Cal.Rptr.2d 567, 27 P.3d 283].)

Here, to prove the prior murder special circumstance, the prosecution introduced evidence that defendant was convicted of murder in Texas in 1980. The jury's prior murder special-circumstance finding is based entirely on this Texas conviction. The issue, then, is whether this Texas conviction "include[s] all the elements of the offense of murder in California." (*People v. Andrews, supra,* 49 Cal.3d at p. 223; accord, *People v. Trevino, supra,* 26 Cal.4th at p. 244.) It does not. The reason it does not, briefly stated, is this: California law recognizes the doctrine of imperfect self-defense, under which a defendant who kills with an actual but unreasonable belief in the need for self-defense is not guilty of murder but may be guilty of manslaughter. Imperfect self-defense is not an affirmative defense; rather, it is inherent in the statutory definition of malice, which is an element of murder. Texas law does not recognize the doctrine of imperfect self-defense, and therefore a Texas murder conviction does not include the element of malice as defined by California law.

To provide a fuller explanation of this reasoning, I begin with the statutory definition of murder in California as "the unlawful killing of a human being, or a fetus, *with malice aforethought.*" (Pen. Code, § 187, subd. (a), italics added.) This statutory definition makes "malice aforethought" (which this court's opinions usually shorten to "malice") an element of murder. (See, e.g., *People v. Rios* (2000) 23 Cal.4th 450, 460 [97 Cal.Rptr.2d 512, 2 P.3d 1066] ["murder includes . . . the element of malice"].)

California law recognizes two forms of malice: express malice and implied malice. (Pen. Code, § 188.) Under the statutory definitions, express malice exists when "there is manifested a deliberate intention *unlawfully* to take away the life of a fellow creature," and implied malice exists "when no considerable provocation appears, or when the circumstances attending the killing show *an abandoned and malignant heart.*" (*Ibid.*, italics added.) As this court has explained, these statutory definitions of express and implied malice incorporate the doctrine of imperfect self-defense.

In the statutory definition of express malice, the word "unlawfully" defines an essential characteristic. (See *People v. Saille* (1991) 54 Cal.3d 1103, 1114 [2 Cal.Rptr.2d 364, 820 P.2d 588] ["express malice and an intent unlawfully to kill are one and the same"].) Because "[a] person who actually believes in the need for self-defense necessarily believes he is acting lawfully" (*In re Christian S.* (1994) 7 Cal.4th 768, 778 [30 Cal.Rptr.2d 33, 872 P.2d 574]), a person who kills intentionally while actually believing in the need for self-defense lacks the intent to kill *unlawfully* and thus lacks express malice (*id.* at pp. 778–780). If the belief in the need for self-defense is unreasonable, the killer, though not guilty of murder, may be guilty of voluntary manslaughter. (*Ibid.*) Thus, under California law, express malice is intent to kill *without* an actual belief in the need for self-defense. (*Ibid.*; see also *People v. Lee* (1999) 20 Cal.4th 47, 81 [82 Cal.Rptr.2d 625, 971 P.2d 1001] (dis. opn. of Kennard, J.); *People v. Breverman* (1998) 19 Cal.4th 142, 189 [77 Cal.Rptr.2d 870, 960 P.2d 1094] (dis. opn. of Kennard, J.).)

This court has construed the statutory definition of implied malice (Pen. Code, § 188 ["when no considerable provocation appears, or when the circumstances attending the killing show an abandoned or malignant heart"]) to mean that the defendant " '*for a base, antisocial motive* and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' " (*In re Christian S., supra,* 7 Cal.4th at p. 780, fn. 4.) As this court has explained, "[a] defendant who acts with the requisite actual belief in the necessity for self-defense does not act with the base motive required for implied malice, i.e., with 'an abandoned and malignant heart.' " (*Ibid.*) If the belief in the need for self-defense is unreasonable, the killer, though not guilty of murder, may be guilty of voluntary manslaughter. (*Ibid.*) Thus, under California law, implied malice is the commission of an intentional act, the natural consequences of which are dangerous to life, with knowledge of the danger (*People v. Lasko* (2000) 23 Cal.4th 101, 107 [96 Cal.Rptr.2d 441, 999 P.2d 666]), but *without* a genuine belief in the need for self-defense (*In re Christian S., supra,* 7 Cal.4th at p. 780, fn. 4).

Here, as mentioned above, the prosecution introduced evidence that defendant was convicted of the crime of murder in Texas in 1980, and the jury's prior murder special-circumstance finding is based on this conviction. As both the majority and the Attorney General concede (maj. opn., *ante,* at p. 684.), Texas law does not recognize the doctrine of imperfect self-defense, so that a defendant who kills with an actual but unreasonable belief in the need for self-defense may be convicted of murder. Because Texas does not recognize imperfect self-defense, a Texas murder conviction does not include the element of malice, either express or implied, as defined by California law. Therefore, defendant's Texas murder conviction does not

"include all the elements of the offense of murder in California" (*People v. Andrews, supra,* 49 Cal.3d at p. 223), and it cannot establish the prior murder special circumstance.

The majority summarily dismisses this argument with the assertion that "the absence of imperfect self-defense . . . is not an *element* of the offense of murder to be proved by the People," but instead it is a " 'mitigating circumstance[]' " that, according to the majority, "may reduce murder to manslaughter by negating malice." (Maj. opn., *ante,* at p. 685.) As support for this assertion the majority cites *People v. Rios, supra,* 23 Cal.4th at page 461. As *Rios* explains, however, "[*i*]*mperfect self-defense* obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand." (*Ibid.*) "Thus, where the defendant killed intentionally and unlawfully, evidence of . . . an actual, though unreasonable, belief in the need for self-defense, is relevant only to determine whether *malice has been established,* thus allowing a conviction *of murder,* or *has not been established,* thus precluding a murder conviction . . . ." (*Ibid.*) These words are not obscure or ambiguous. They can mean only one thing: Malice as an element of the crime of murder under California law includes as an essential component the absence of imperfect self-defense. It necessarily follows that a foreign conviction, such as defendant's Texas murder conviction, that does not establish the absence of imperfect self-defense does not include the element of malice, and cannot support a prior murder special circumstance.

Moreover, it is the prosecution, not the defense, that has the burden of proof on the issue of imperfect self-defense. (*People v. Rios, supra,* 23 Cal.4th at p. 462.) When a factual circumstance negates an element of the crime, as imperfect self-defense negates malice, the federal Constitution's due process guarantee requires the prosecution to bear the burden of proving the absence of that circumstance beyond a reasonable doubt. (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 704 [44 L.Ed.2d 508, 95 S.Ct. 1881]; *Walker v. Endell* (9th Cir. 1988) 850 F.2d 470, 472.) The elements of a crime are "[t]hose constituent parts of a crime which must be proved by the prosecution to sustain a conviction." (Black's Law Dictionary (5th ed. 1979) p. 467.) To sustain a conviction for murder under California law, the prosecution must prove malice and, in so doing, must prove the absence of imperfect self-defense. Accordingly, the absence of imperfect self-defense is an element, or an essential component of an element, of the offense of murder.

The Attorney General argues that a decision of the Court of Appeal holding that defendant's Texas murder conviction qualifies under the prior murder special circumstance (*People v. Martinez* (1991) 230 Cal.App.3d 197 [281 Cal.Rptr. 205]) established the law of the case that this court must adhere to.

The doctrine of the law of the case, on which the Attorney General relies, applies in criminal as well as civil matters and even in death penalty cases. (*People v. Stanley* (1995) 10 Cal.4th 764, 786–787 [42 Cal.Rptr.2d 543, 897 P.2d 481].) But the doctrine is intended merely to enhance judicial economy, and it is not applied when the earlier decision was a "manifest misapplication of existing principles resulting in substantial injustice" (*People v. Shuey* (1975) 13 Cal.3d 835, 846 [120 Cal.Rptr. 83, 533 P.2d 211]), or when "the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations" (*People v. Stanley, supra,* at p. 787). Both of these exceptions exist here.

Imposing the death penalty on a defendant for a killing without any qualifying special circumstance is a "substantial injustice" under our law, which requires at least one special circumstance before capital punishment may even be considered. The Court of Appeal's decision was a "manifest misapplication of existing principles" because the Court of Appeal did not recognize that the statutory definition of malice in California excludes any killing committed with an actual belief, whether reasonable or not, in the need for self-defense. This court's decision in *In re Christian S., supra,* 7 Cal.4th 768, which clarified the controlling rule of law—that imperfect self-defense is inherent in the statutory definitions of express and implied malice—was decided in 1994, three years *after* the Court of Appeal's decision, and thus it is an intervening decision establishing an exception to the doctrine of law of the case.

Like the majority (maj. opn., *ante,* at p. 688.), I see no need to decide whether, as the Attorney General argues, this court may look beyond the statutory definition of murder in Texas to determine whether defendant's Texas conviction includes all the elements of murder in California. Nothing in the record of the Texas murder conviction (see *People v. Guerrero* (1988) 44 Cal.3d 343, 345 [243 Cal.Rptr. 688, 748 P.2d 1150]) establishes that defendant did not kill with an actual belief in the need for self-defense. On the contrary, the presentence report includes defendant's statement that he drew his gun and fired the fatal shot because the victim "appeared to be reaching underneath the seat for a weapon." (Maj. opn., *ante,* at p. 680.)

For these reasons, I would affirm the judgment as to guilt only and would reverse the judgment as to special circumstance and as to the penalty of death.

Appellant's petition for a rehearing was denied November 12, 2003, and the opinion was modified to read as printed above. Kennard, J., was of the opinion that the petition should be granted.