Filed 3/7/14  P. v. Sanchez CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL LEE SANCHEZ,<br><br>    Defendant and Appellant. | B242140<br><br>(Los Angeles County<br>Super. Ct. No. BA365475) |

APPEAL from a judgment of the Superior Court of Los Angeles County, J. Henry Hall, Judge.  Affirmed.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

Michael Lee Sanchez appeals the judgment entered following a jury trial in which he was convicted of second degree murder with the use of a knife. (Pen. Code, §§ 187, subd. (a), 12022, subd. (b)(1).)[1] At sentencing, the trial court imposed a total term in state prison of 16 years to life, consisting of a term of 15 years to life for the murder, enhanced by a one-year term for the use of the knife.

## CONTENTIONS

Sanchez (appellant) contends the prosecutor committed prosecutorial misconduct by arguing to the jury the provocation for voluntary manslaughter must be such as would cause a reasonable person to kill. In another contention, he claims there was additional prosecutorial misconduct during the prosecutor's final comments to the jury: the prosecutor showed a pre-death photograph of the victim to the jury, he attempted improperly to appeal to the sympathy of the jury by referring to the victim and her family and the victim's smile, and he attempted to inflame the jury by making comments to the jury that amounted to an improper appeal to the "conscience of the community." Despite appellant's failure to enter proper objections in order to preserve any error for the appeal, appellant asserts a number of grounds that purportedly permit this court to address the claimed prosecutorial misconduct. If this court finds a forfeiture and thus fails to consider his contentions on the merits, appellant urges a reversal of his conviction on the grounds of ineffective trial counsel.

This court concludes the contentions lack merit.

## BACKGROUND

1. *The trial evidence.*

Appellant is not challenging the sufficiency of the evidence. Hence, the trial evidence is stated briefly.

---

[1] All further references to the Penal Code unless otherwise indicated.

2

a. *Blanca Valdez's December 2, 2009, disappearance.*

In 2009, Blanca Valdez (Blanca) lived with her sister, Claudia Mayorquin (Claudia), in South Gate. On December 2, 2009, at about 5:45 a.m., after Blanca drove up in her truck to her sister's residence, Blanca disappeared. The next day, in the afternoon of December 3, 2009, the police discovered Blanca's truck parked on 51st Street west of Central Avenue in Los Angeles. South Gate Police Officer Carlos Corella found Blanca dead on the floor board of the truck.

At trial, a Los Angeles County deputy medical examiner testified that the cause of Blanca's death was a seven-inch incised knife wound across the front of her throat that had cut her neck to the spine. There were petechia on her face, eyes, gums and inner lip indicating she was strangled prior to death.

b. *The trial testimony establishing an abduction.*

Blanca's boyfriend, Juan Rubio (Rubio), testified that on December 1, 2009, Blanca stayed overnight with him at his residence. They parted at 5:30 a.m. at the location where he worked in Carson. Shortly thereafter, on her cellular telephone, Blanca texted Rubio she had arrived home safely and could see lights on in Claudia's residence. She texted she would contact him again when she arrived at the beauty salon where she worked. At 6:45 a.m. that morning, Rubio started receiving texts from Blanca's cellular telephone that were nasty and sexually explicit. She did not communicate in such a fashion with Rubio. He telephoned Blanca repeatedly, but she failed to answer her telephone. He continued getting strange texts and telephoned the police at 7:18 a.m. Rubio also telephoned Claudia. Claudia told him that she also had received an uncharacteristic text from Blanca's cellular telephone and she could not reach Blanca by telephone.

Blanca's sister, Claudia, testified that despite the danger appellant presented, Blanca never carried weapons and never kept a knife in her truck. Claudia said that she had texted Blanca in reply on the morning of December 2, 2009, that if Blanca did not answer her telephone, Claudia was telephoning the

3

police.  Claudia said that when Blanca did not answer her cellular telephone, she feared appellant, a former boyfriend, had abducted her.

At trial, Blanca's family and friends testified that Blanca and appellant had a tumultuous and violent relationship.  Blanca had told Claudia during one recent party that she and appellant had argued about appellant seeing other women.  During the altercation, appellant had grabbed Blanca by the throat and had choked her until she blacked out.  After the recent breakup, Blanca had started dating Rubio and had decided not to see appellant any more.  Appellant was stalking Blanca and had threatened if he could not be with her, she could not be with anyone else.  He had threatened that if she would not see him, he would rape her daughters and disfigure her son.  He had threatened to kill everyone who was living in Claudia's household.  He pursued Blanca relentlessly.

Blanca was so afraid of appellant, she presently would go nowhere alone.  Rubio accompanied her to work and home and texted her to make sure she reached each destination.  Claudia testified she had concluded this last breakup with appellant was permanent -- Blanca had cut off all contact with appellant, including blocking appellant's ability to contact her by text and telephone.  She also sought a restraining order that was never issued due to an error in the arrangements for personal service.

Tereza Marroquin, a coworker, testified appellant harassed Blanca at the beauty salon.  He went so far as to book all her appointments so on occasion she had no customers.  Tereza walked Blanca to her car when they left the beauty salon.

On December 2, 2009, the police contacted appellant concerning Blanca's disappearance.  Appellant showed no concern and said he last had seen Blanca two days previously.  He claimed at that time they were discussing getting back together.  He lied to the police about his whereabouts at the time of Blanca's disappearance.

4

c. *Appellant's December 3, 2009, statement to the police.*

Late on December 3, 2009, appellant was arrested. After a *Miranda* waiver (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]), Los Angeles Police Officer Julio Benevides (Officer Benevides) interviewed appellant in the presence of two other police officers. Initially, appellant denied any involvement in the homicide. After several hours, appellant admitted killing Blanca. Appellant told Officer Benevides that he was "madly in love with Blanca" and "just couldn't take it that she was with somebody else." He killed her for himself. He had suffered terribly after they broke up. He killed her as he "figured if she wasn't there," he "couldn't hurt no more." If she were dead, she could not be with her new boyfriend so it would be okay for appellant to go on with his life, even though he might be in jail forever.

Appellant explained that prior to her death, they had broken up. Bianca had threatened to get a restraining order against him, but he was never served. That made him think he and Bianca would be getting back together. So he had hoped, but she dashed his hopes when she told him on Wednesday morning, December 2, 2009, she was spending the nights with her new boyfriend.

He told the officers that on December 2, 2009, he went over to Blanca's residence shortly after 5:00 a.m. She was outside in her truck and let him into the truck. They drove to another location where she told him "it was over." Appellant grabbed her by the throat and put her in a "lock hold." He could see her face was turning colors. She went still. He was aware that she had a knife in the rear seat of her car. He retrieved it from the back seat and cut her throat with it and then threw her in the truck's back seat. He could hear her in the backseat gasping for air. He climbed into the backseat and cut her throat again. She was not bleeding from the prior wound, but now she bled a lot. He drove to the railroad tracks near Independence and Santa Fe Avenues in South Gate and threw out the knife. He then drove around until Blanca stopped making noise.

5

He parked the truck in front of a little restaurant and left Blanca there in the rear seat of the truck.

Appellant admitted taking Blanca's cellular telephone and texting Blanca's sister and boyfriend as if he were Blanca.

### d. *The defense.*

At the trial, appellant declined to testify and produced no affirmative evidence in defense.

### e. *The conclusion of the trial.*

The prosecutor urged the jury to convict appellant of first degree murder. Trial counsel argued that appellant had committed voluntary manslaughter.

The trial court instructed the jury on first degree murder on theories of lying in wait and willful, deliberate and premeditated murder, on second degree murder, and on voluntary manslaughter. The trial court used the 2008 version of CALCRIM No. 570 in charging the jury.

The jury returned a verdict of second degree murder.

## DISCUSSION

### 1. *The relevant principles concerning prosecutorial misconduct.*

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

"In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.) Although a single instance of misconduct may not require a reversal of a conviction, the cumulative effect of a pattern of such conduct may. (*People v. Hill* (1998) 17 Cal.4th 800, 845-846.)

" '[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper. . . . ' "When [a prosecutorial misconduct] claim focuses on comments made by the prosecutor before the jury, a court must determine at the threshold how the remarks would, or could, have been understood by a reasonable juror. [Citations.] If the remarks would have been taken by a juror to state or imply nothing harmful, they obviously cannot be deemed objectionable." [Citation.]' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 1043 (*Tully*); see also *People v. Welch* (1999) 20 Cal.4th 701, 752 [the prosecution has broad discretion to state its views as to what the evidence shows and the inferences to be drawn from the evidence].)

2. *The prosecutor's closing comments regarding adequate provocation.*

Appellant contends the prosecutor committed misconduct by misstating the standard for adequate provocation, an element of voluntary manslaughter. He asserts the prosecutor's remarks were prejudicial as they likely confused the jury and the jury rejected a verdict of voluntary manslaughter in favor of one of murder of the second degree.

a. *The prosecutor's remarks.*

The remarks in question are italicized below.

"[Trial counsel] asked you to return a verdict of voluntary manslaughter and tells you that relationships are classic examples of voluntary manslaughter. Some extreme situations are. [The prosecutor then set out an example of a classic

7

voluntary manslaughter killing in which a married person is surprised upon coming home and finding his or her spouse in bed with another person.]

"That is a textbook example of what maybe [is] voluntary manslaughter. Those types of feelings and emotions are extreme given that situation. And so the law allows for that possibility. It doesn't say that's what it is, but it allows for that possibility. But, of course, our laws are written in such a way that they are kind of broad so that an argument can be made before you that the facts in this case are applicable to that law.

"So I urge you to look closely at the law so that you know that in situations like the one we have before us, that's not the case. Because it tells you, that there has to be provocation. But it tells you that it is not enough that a defendant simply was provoked.

"The defendant is not allowed to set up his own standard of conduct. *It's a reasonable person. Would a reasonable person have acted that way that the defendant acted? That's what you look at. And [if] you were to follow the argument in its logic, any time someone breaks up with someone, there's going to be emotions. There's going to be hurt feelings, going to be broken hearts, and so therefore is that going to justify somebody being able to kill the person who no longer wants to be with them? Of course not. The law tells you that. I want you to read that carefully and you'll see it doesn't apply. And all of you will agree that it doesn't apply. And since it doesn't apply, we're left with a murder.*" (Italics added.)[2]

___

[2]     The trial court instructed the jury, inter alia, with CALCRIM No. 570, concerning voluntary manslaughter, as follows.

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND

8

b. *Forfeiture*

At the outset, the parties agree trial counsel failed to object to the above remarks.

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.]" (*People v. Hill, supra,* 17 Cal.4th at p. 820.)

"A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm. (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.)" (*People v. Linton* (2013) 56 Cal.4th 1146, 1205 (*Linton*).)

---

[¶] 3. *The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.*
"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than judgment. [¶] If enough time has passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (Italics added.)

9

Appellant cites the decision in *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 (*Williams*), for the proposition that a reviewing court always has discretion to reach an issue that was not preserved by a party.  Relying on *Williams*, appellant urges this court to exercise its discretion to address his claim despite the forfeiture.

We decline the invitation.  A " 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." (*People v. Partida* (2005) 37 Cal.4th 428, 434.)  ' "[I]t is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial." '  [Citation.]  ' "The purpose of the general doctrine of waiver is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . ." '  [Citation.]" (*People v. Saunders* (1993) 5 Cal.4th 580, 590.)

Our review of the record reflects no exception to the general principle an objection and  timely admonition would have obviated any misleading impressions created by the prosecutor's argument.

Appellant also urges this court to address his contention as making such comments involves the denial of a constitutional right.  We examined the authorities he cites supporting this request – section 1259 (a  court has discretion over scope of appellate review), *People v. Vera* (1997) 15 Cal.4th 269, 277 (pre-*Apprendi* waiver of right to a jury trial on an enhancement),[3] *People v. Saunders, supra,* 5 Cal.4th at p. 592 (waiver of plea of once in jeopardy), and *People v. Holmes* (1960) 54 Cal.2d 442, 443-444 (waiver of the right to a jury trial).  None of these authorities are pertinent to this case or persuade us the comments here implicate appellant's constitutional rights.

Accordingly, we deem the contention forfeited.

---

[3]     *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348].

Appellant next argues this court should reach the merits of his contention as trial counsel was ineffective for failing to object.  We will address the merits, *infra*, to the extent necessary to determine his claim of ineffective assistance of trial counsel.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 431; *People v. Scaffidi* (1992) 11 Cal.App.4th 145, 151 & fn. 2 (*Scaffidi*).)

3. *Ineffective trial counsel.*

Appellant contends his trial counsel should have objected to the above remarks because they constituted *Najera* error, and after objecting, trial counsel should have requested a clarifying jury instruction.  (*People v. Najera* (2006) 138 Cal.App.4th 212 (*Najera*).)  Appellant urges on this record he is entitled to a reversal of the judgment as trial counsel rendered him ineffective assistance of counsel.  He asserts there is no satisfactory tactical reason for trial counsel's failure to object and to request a clarifying jury instruction.

a. *The standard of review.*

" In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.  (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.)  A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.  Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.  (*Strickland v. Washington*, *supra,* at p. 687; *In re Andrews* (2002) 28 Cal.4th 1234, 1253.)  If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.  (*People v. Mendoza Tello* (1997)

11

15 Cal.4th 264, 266 . . . .)" (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*).)

These standards apply with particular force at closing argument because, as we have recognized, " '[t]he decision of how to argue to the jury after the presentation of evidence is inherently tactical . . . .' [Citation.]" (*People v. Gamage* (2010) 48 Cal.4th 347, 391 (*Gamage*).)

"[T]he inquiry into an ineffectiveness of counsel claim involves two prongs. . . . (*Strickland, supra*, 466 U.S. at pp. 687, 694.) . . . 'there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' (*Id*. at p. 697.)" (*Scaffidi*, *supra*, 11 Cal.App.4th at p. 151, fn. 2.)

   b.  *The* a*nalysis.*

In *Najera*, *supra*, 138 Cal.App.4th  212, the prosecutor made the following remarks.

"Heat of passion is not measured by the standard of the accused . . . . As a jury, you have to apply a reasonable, ordinary person standard, okay. [¶] . . . Any reasonable ordinary person walking in on a child being molested, if they had a gun in their hand, would probably do the same thing. . . . Would a reasonable person do what the defendant did?  Would a reasonable person be so aroused as to kill somebody?  That's the standard." (*Najera, supra*, 138 Cal.App.4th at p. 223, italics omitted.)

Later, in rebuttal, the prosecutor said:  " '[T]he reasonable, prudent person standard . . . [is] based on conduct, what a reasonable person would do in a similar circumstances.  Pull out a knife and stab him?  I hope that's not a reasonable person standard.' " (*Najera, supra*, 138 Cal.App.4th at p. 223, italics omitted.)

The *Najera* court concluded the prosecutor's comments were misleading. (*Najera, supra*, 138 Cal.App.4th at p. 223.)  The court explained a particular

12

homicide may constitute voluntary manslaughter if the "killer's reason was obscured by a ' "provocation" ' sufficient to cause an ordinary person of average disposition to act rashly and without deliberation. [Citation.] The focus is on the provocation – the surrounding circumstances – and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*Ibid.*)

No reversal was ordered in *Najera*, however, as the reviewing court concluded there was a forfeiture as trial counsel had entered no objection to the misstatements by the prosecutor. Further, the *Najera* court held trial counsel was not ineffective as at the outset, the trial evidence was insufficient to warrant a manslaughter instruction. (*Najera, supra*, 138 Cal.App.4th at pp. 224-225.)

In another recent decision, *People v. Beltran* (2013) 56 Cal.4th 935 (*Beltran*), the court addressed a similar claim where the prosecutor had "muddied the waters" concerning the trial court's jury instruction on voluntary manslaughter by making comments suggesting an erroneous standard concerning the adequacy of the provocation. (*Id*. at p. 954) The *Beltran* court explained the history of this aspect of voluntary manslaughter and said the following.

" '[T]he relevant standard is an objective one. [*People v. Logan* (1917) 175 Cal. 45] recognized that 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man. Thus, no man of extremely violent passion could so justify or excuse himself if the exciting cause be not adequate, nor could an excessively cowardly man justify himself unless the circumstances were such as to arouse the fears of the ordinarily courageous man. Still further, while the conduct of the defendant is to be measured by that of the ordinarily reasonable man placed in identical circumstances, the jury is properly to be told that the exciting cause must be such as would naturally tend to arouse the

13

passion of the ordinarily reasonable man.  But as to the nature of the passion itself, our law leaves that to the jury, under these proper admonitions from the court.' (*Logan, supra,* 175 Cal. at p. 49.) . . . 'it is not a matter of law but a matter of fact for the jury in each case to determine under the circumstances of the case whether the assault or whether the blow, or whether the indignity or whether the affront, or whatever the act may be, was such as is naturally calculated to arouse the passions and so lessen the degree of the offense by relieving it from the element of malice.' [The court in *Maher v. People* (1862) 10 Mich. 212 (*Maher*)] similarly explained that if the standard for provocation was purely subjective, 'then, by habitual and long continued indulgence of evil passions, a bad man might acquire a claim to mitigation which would not be available to better men, and on account of that very wickedness of heart which, in itself, constitutes an aggravation both in morals and in law.' (*Maher, supra*, 10 Mich. at p. 221.)" (*Beltran, supra*, 56 Cal.4th at pp. 950-951.)

The *Beltran* court said, "Provocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' (*Logan, supra*, 175 Cal. at p. 49.)"  (*Beltran, supra*, 56 Cal.4th at p. 957.)  That court explained using the erroneous standard for adequate provocation of whether "an ordinary person of average disposition would be moved to kill" conflicts with the reasons mitigation is permitted in heat-of-passion killings.  (*Id.* at p. 949.)

"[S]ociety expects the average person not to kill, even when provoked. . . . [W]e punish a person who kills in the heat of passion or upon provocation because '[h]e did not control himself as much as he *should* have, or as much as common experience tells us he *could* have, nor as much as the ordinarily law-abiding person *would* have.' [Citation.]  However, if one *does* kill in this state, his punishment is mitigated.  Such a killing is not justified but *understandable* in light of 'the frailty of human nature.' [Citation.]  The killing reaction therefore is the *extraordinary* reaction, the unusual exception to the general expectation that the

14

ordinary person will not kill even when provoked." (*Beltran, supra*, 56 Cal.4th at p. 949.)

In the instant case, there is no prosecutorial misconduct. While potentially misleading, the prosecutor said nothing that directly conflicted with the principles set out in *Najera* and *Beltran*. His comments did not purport to restate the entire principle of law contained in the trial court's jury instruction on adequate provocation. Instead, the prosecutor strongly exhorted the jury to focus on the trial court's jury instruction on the point, which in the 2008 version of CALCRIM No. 570 correctly states the law concerning adequate provocation. (See *Beltran, supra* 56 Cal.4th at p. 954 & fn. 14.) The prosecutor's comments appear to be more incomplete than erroneous, and the prosecutor referred the jury to the proper standard. Accordingly, there is no reasonable likelihood that the prosecutor's comments confused the jury. Rather, we presume the jury did just as the prosecutor suggested--in making its determination as to whether the circumstances amounted to adequate provocation, the jury carefully examined the trial court's instruction, CALCRIM No. 570, and determined the adequacy of the provocation by considering whether a person of average disposition would have been induced to react from passion, rather than from judgment.

Furthermore, this record discloses trial counsel was never asked about the reasons she failed to object to the complained-of comments. (*People v. Frierson* (1991) 53 Cal.3d 730, 749 [ "[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal."].) In this trial, trial counsel had an uninterrupted opportunity to urge the jury to bring in a verdict of voluntary manslaughter. The complained-of remarks essentially directed the jury to the pertinent jury instruction and that instruction contained a proper statement of law. No doubt trial counsel concluded there was little to be gained by making an objection.

15

4. *The remaining claims of prosecutorial misconduct.*

Appellant contends the prosecutor made further remarks that were misconduct as they were an improper attempt to inflame the jury, play to the jury's sympathy and appeal to the jury as the "conscience of the community."

a. *The relevant legal principles*

" 'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." [Citation.]' [Citation.]" (*Linton, supra*, 56 Cal.4th 1146, 1210.)

"A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear. [¶] *United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994) [citations]." (*United States v. Leon-Reyes* (9th Cir. 1999) 177 F.3d 816, 822.)

It is misconduct for a prosecutor to suggest that jurors disregard the trial court's jury instructions and consider public opinion or the protection of the community in determining the guilt phase of a trial. (*People v. Morales* (1992) 5 Cal.App.4th 917, 928; see also *People v. Whalen* (2013) 56 Cal.4th 1, 77; *People v. Redd* (2010) 48 Cal.4th 691, 743, fn. 25 [a prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking].)

Predeath and post-death photographs of a victim may be relevant for identification purposes and to establish the nature of the homicide in a murder case, and a trial court has discretion to admit such photographs as part of the

16

prosecution's case-in-chief. (*People v. Martinez* (2003) 31 Cal.4th 673, 692-693 [no reasonable possibility of prejudice arose from the admission in the penalty phase of a capital case from the prosecutor's use of "quite ordinary family photographs."]; cf. *Tully, supra*, 54 Cal.4th at p. 1021 [the possibility predeath photographs shown to witnesses during trial may have generated sympathy for the victims was not enough to require the photographs' exclusion from evidence during the guilt or the penalty phase of the trial].)

　　b. *The complained-of remarks.*

Trial counsel commenced his final comments to the jury by remarking as follows. (We have italicized the specific remarks appellant claims constituted prosecutorial misconduct.)

"*December 2, 2009, that man right there, [appellant] ended the life of a mother, a daughter and [a] sister.* His jealousy, his rage, his inability to let her go, resulted in him not only strangulating her but to ultimately cutting her, killing her and dumping her body." (Italics added.)

The prosecutor then summarized the trial evidence. He told the jury, "The only thing I want to influence you are the facts in this case and the overwhelming evidence that was presented to you." He summarized the law. After asking the jury to return a guilty verdict, the prosecutor said, "*Now I want to start off by reminding you by showing you this beautiful picture of Blanca Valdez with her smile. The smile that's here no more because of Mr. Sanchez.* And I know you are subjected to see other photographs of Blanca Valdez, and unfortunately we have to do that. Because we have the burden to establish what happened. And so those photographs[,] even though they weren't as many as may have been taken, the ones that were important and critical to establishing what happened are here before you." (Italics added.)

17

After the prosecutor completed his opening remarks, trial counsel argued in defense. In commenting on the evidence, trial counsel told the jury the prosecutor was attempting to inflame the jurors' passions. The prosecutor had done so by examining Blanca's sister Claudia at trial whether she had a sister that was alive. He also displayed to Claudia the "hideous bloody knife" and a "gruesome photo of Blanca's lifeless body." Trial counsel argued defendant never wanted to see the deceased in that condition. "No one ever needs to see that image again." Trial counsel said, "But your prejudice and sympathy can't allow you to come to an unjust conclusion or verdict." Trial counsel commented on how appellant initially denied the murder but soon disclosed to the detectives the truth. "But trying to inflame your passions isn't right. It just isn't. And the court said you're not to consider sympathy for Blanca or for Blanca's family. You're asked to consider the facts that we have here . . . ." Trial counsel then summarized appellant's despair at realizing Blanca was no longer going to be seeing him.

The prosecutor opened his rebuttal remarks with the following.

"I agree with a couple of things that counsel presented in her closing argument. The first being that she's right, no one needs to see these images again. *And the only way we can make sure that no one sees these images again is a courtroom [is] if all 12 of you agree to the logical conclusion*, the only conclusion you should reach in this case, and that is [appellant] murdered Blanca Valdez. He is guilty of murder in the first degree." (Italics added.)

After these remarks, trial counsel said, "Objection, Your Honor." The trial court replied, "Overruled."

The prosecutor went on to argue applying the law to the facts resulted in only one conclusion: This killing was murder. He said, "*Once you apply those facts, I trust that you will ensure that these images will not have to be seen again. You'll return a verdict of guilty for murder in the first degree. Thank you.*" (Italics added.)

c. *Forfeiture.*

Again, trial counsel failed to object to the complained-of comments, with one exception. But when trial counsel made her one objection, she failed to state the specific grounds for her objection or to request an appropriate admonition be given to the jury to disregard the comments. In the circumstances, the contentions on appeal are forfeited. (*People v. Wash* (1993) 6 Cal.4th 215, 259-260; *People v. Poggi* (1998) 45 Cal.3d 306, 335.)

Appellant acknowledges there was only one objection – to the prosecutor's reference to the properly admitted gruesome photographs used at trial to establish the manner of death. Appellant argues the requirement for an objection for the later remarks should be excused because the record shows a further objection would have been futile.

Appellant's complaint of futility is not supported by any factual assertions tied to our record. That the trial court overruled one general objection during the prosecutor's remarks fails to show that other, specific objections to the prosecutor's remarks necessarily would have been futile. On this record, the lack of a statement of grounds for an objection may well have been the reason the trial court overruled the objection. We cannot assume the trial court would not have sustained a proper objection to any improper remarks made by the prosecutor. Appellant cannot avoid the forfeiture. (*People v. Pearson* (2013) 56 Cal.4th 393, 424-425 [commenting on the circumstances necessary for finding an objection may have been futile]; *Tully, supra*, 54 Cal.4th at p. 1037, fn. 31[discussing futility].)

d. *Ineffective trial counsel.*

Insofar as appellant urges a reversal on the basis trial counsel's failure to object constitutes ineffective trial counsel, he cannot prevail.

As set forth earlier, counsels' jury arguments are inherently tactical. (*Gamage, supra*, 48 Cal.4th at p. 391.) Here, trial counsel initially argued adequate provocation and that appellant killed in the heat of passion having

19

discovered his former lover was having sexual relations with her new boyfriend. Trial counsel then spent the remainder of her argument reinforcing the trial court's standard jury instruction that it is improper for the jury to decide the case on the basis of bias, sympathy, prejudice, or public opinion.

Trial counsel reminded the jurors they were the finders of fact and "passion, prejudice, bias and sympathy," "powerful emotions," should play no part in their deliberations. Trial counsel pointed out the entire scenario of Blanca's death was a "tragedy" and there were "no winners here." The only issue in the case was "why did it happen?" She urged them to "turn[] off some emotions" and "do the right thing even though it's painful . . . ." Trial counsel claimed the prosecutor had "tried to inflame your passions," "which would be easy in a case like this." She pointed out to the jury any prosecutorial remarks that she viewed as constituting an appeal to the passion, sympathy and prejudice of the jury. And she urged the jury to reach a just verdict by avoiding considering the understandable prejudice and sympathy jurors might feel for Blanca and her family.

The record fails to contain any evidence as to why trial counsel failed to object to the complained-of remarks. (See *Gamage, supra*, 48 Cal.4th at p. 391.) But we see in trial counsel's argument that she addressed the fleeting comments by the prosecutor concerning Blanca and her photographs, her smiling face and references to the grief of Blanca's family by using the trial court's instruction to remind the jurors they were objective fact finders. She addressed any appeal to the sympathy and passion of the jury by the prosecutor in her argument rather than incurring the wrath of the judge and jury by continually interrupting the prosecutor's argument. As this tactic was far more effective than merely objecting a few times to the prosecutor's comments and obtaining a curative admonishment, we cannot conclude trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.

20

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                    KLEIN, P. J.


We concur:


        KITCHING, J.


        ALDRICH, J.


21