Filed 12/17/14  P. v. Abiel CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064565 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD244879) |
| ABAN ABIEL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed.

Cannon & Harris and Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Julie L. Garland, Assistant Attorneys General, William M. Wood and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Aban Abiel of the second degree murder of Marko Aluat (Pen. Code,[1] § 187, subd. (a)), and found true an allegation that he used a knife in the commission of the offense within the meaning of sections 12022, subdivision (b)(1) and 1192.7, subdivision (c)(23). The trial court sentenced Abiel to an indeterminate term of 15 years to life plus a one-year knife-use enhancement, and ordered him to pay various fines, fees and restitution. Abiel contends the trial court prejudicially erred by instructing the jury with CALCRIM No. 3471 on mutual combat, which violated his right to present a defense under the United States and California Constitutions. Alternatively, Abiel contends the instruction was unsupported by the evidence, requiring reversal of his conviction, which he asserts was based on an unsupported theory that he did not act in lawful self-defense. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

On February 17, 2012, Abiel attended an event at "Club Kabanas" in Clairemont (the club), a location used for parties and gatherings. Also there were Faroog Maluahi, Madol Wiir, Kedid Manon and victim Marko Aluat. All of the men were friends from the Sudanese community. Aluat and Wiir were best friends. At some point, Abiel told Manon and Kuol Monythot, who was acting as a security guard, that Aluat had pushed him. Abiel was visibly upset. Manon told Abiel not to take it seriously; that Aluat was just playing around. After Manon returned to the club, he heard a fight erupt, and when

---

[1]    Statutory references are to the Penal Code unless otherwise specified.

he went outside he saw Abiel and Wiir fighting. Abiel was screaming and angry, exclaiming at one point, "You a bitch homie."[2] Police arrived and told everyone to go home.

Manon and Maluahi left the club and drove to Maluahi's apartment. While in the car, Abiel called Maluahi and asked to speak with Manon. Abiel was cussing at Manon and told him, "I'm going to beat you if I get you." Manon asked what he had done; he did not understand why Abiel was acting hostile toward him. When Maluahi and Manon got to Maluahi's house, Abiel was there. As Manon was getting out of the car, Abiel came running up yelling and cussing, and started to attack him. The men argued, shoving each other, with Manon trying to get Abiel off of him. Monythot and Maluahi broke up the fight, and police eventually arrived. A police officer took Manon home. Manon was crying and upset. Abiel, Maluahi, Monythot and Maluahi's girlfriend returned to Maluahi's apartment, where they looked unsuccessfully for Abiel's car keys. Because Abiel had parked on the sidewalk illegally, he decided to sleep in his car so it would not get towed. Maluahi gave Abiel a blanket and returned to his apartment to sleep.

After Manon got home, he called several people, including Aluat and Abiel, to find out why Abiel was acting in such a way. Abiel accused Manon of taking his car

---

2     Manon identified Abiel's voice on a 911 call recorded at 3:34 a.m. on February 18, 2012. In that call, an unidentified man (No. 1) says, "Hey, stop. Aban," and tells everyone to go home. Another unidentified man says, "I'm not the one (unintelligible) He trying to do this because Marko [Aluat] get mad and whatever then he try to come (unintelligible) mother fucker (unintelligible) tonight. The first unidentified man says, "Aban, Aban, Aban, Aban, Aban, Aban, c'mon man (unintelligible) everybody gotta leave, man (unintelligible) just leave. He then urges Abiel to get in the car to leave because he did not want to get arrested.

keys and hung up. Manon denied taking Abiel's keys, but later realized he in fact had them in his pants pocket. Manon decided to return to Maluahi's house to return a parking ticket and end his association with the men. He planned to walk there, but while he talked to Aluat on the phone, Aluat told him he wanted to go with him.[3]

At around 4:00 a.m. or 5:00 a.m. on February 18, 2012, Aluat called his girlfriend, Tonisha Alexander, to pick him up from Wiir's house. According to Alexander, Aluat received multiple phone calls from the time he got in her car; his phone was "constantly ringing." Aluat was not angry, upset or drunk. After several hours, Aluat instructed Alexander to drive to Manon's house to pick up Manon, who Alexander noticed was anxious. Aluat then told her to go to Maluahi's house. When they arrived, Manon left the car first and started walking to Maluahi's house. Aluat spoke briefly with Alexander, who drove away when Aluat waved her off.

Before Manon got to Maluahi's door, he heard Aluat and Abiel yelling and rushed back to them. Abiel had a knife and was standing next to Aluat, who was on the ground. Alexander, who had returned to the scene after looking back and seeing Aluat lying in the street, was screaming, "He had a knife, he had a knife." Manon asked Abiel if he wanted to stab him with it. Abiel punched Manon and walked toward Maluahi's apartment. Manon followed and when Abiel got close to Maluahi's door, Abiel yelled for Maluahi to

---

3      Manon testified, "I was explaining to [Aluat] on the phone, I tell him, you know, about this happen, and I don't know why [Abiel] is attacking me, so all I just need to do right now, I don't think I need to hang out with anybody like that anymore, so I'm going to just go back right now and go give the ticket to [Maluahi] and tell them I don't want to hang out with you guys anymore so I going to stop coming over there, so he was, like, 'Wait for me, I want to go with you.' I go, 'Okay.' "

come out and said, "These people, they come to jump me." Manon told Abiel they had not come there to jump him. Abiel called 911 while he walked into the alley and threw the knife into a dumpster, then returned and punched Manon again. Abiel denied to the 911 operator having any weapons, but claimed he had been attacked in his car and that he had hit Aluat, who went down and needed an ambulance. Police arrived while Abiel was still speaking with the 911 operator. An officer handcuffed Abiel, who had a small abrasion on his thumb and a small cut on the inside of his lip. Abiel complained to the officer that his face hurt, but he declined medical assistance.

Nineke Koopman, who lived in the area, was awoken early in the morning of February 18, 2012, by loud yelling and called police. She saw four to six black individuals, mostly men, yelling back and forth. When police arrived, some of the individuals left and an officer offered one of the men a ride home. Koopman heard yelling again at about 6:45 that morning. She looked out to see the same three or four individuals yelling at each other. One of the men, who she identified at trial as Abiel, advanced and took a swing at the other, who had been backing away. The man who was trying to get away fell to the ground and never got up. A third man was watching the fight and another was off to the side on his phone. The woman did not see the falling man hit kick or shove Abiel, or physically attack him. Koopman saw Alexander drive up and jump out of her vehicle while Abiel walked back toward the apartment complex.

Aluat suffered a stab wound to his chest, and was in a coma from the time of the stabbing until his feeding tube was removed, resulting in his death. Aluat would not have died but for the stabbing, and the medical examiner ruled his death a homicide.

5

*Defense Evidence*

Abiel testified in his own defense. He claimed that while at the club, Aluat approached him and he extended his hand but that Aluat responded by punching him in the head. Abiel asked him to stop, but Aluat pushed him. Abiel then spoke to Monythot, who removed Aluat from the club. Abiel testified he left the club at about 3:00 a.m. and while he walked to his car, was approached by Wiir, Manon and Aluat. Abiel told Wiir that Aluat had punched him, and the men began pushing and punching each other. Aluat and Manon also punched Abiel, who fought back. Police eventually arrived.

While Abiel was heading home, he called Manon to ask why he was fighting with him but Manon ended the call. He then called Maluahi, who was with Manon. Abiel asked to speak with Manon, but Manon again ended the call. Abiel went to Maluahi's house, and when Manon eventually arrived there and saw him, Manon "rushed" him. Abiel grabbed Manon, who started throwing punches. Police arrived and Manon walked away, but as soon as police left, he returned and tried to engage in another fight with Abiel. Police returned and gave Manon a ride home. After police left, Abiel could not find his car keys, and tried to call Manon to beg for his keys. Manon cussed at him and ended the call. Abiel decided to sleep in his car, which was blocking the sidewalk. While he was resting, he texted his employer and went through his phone.

Abiel testified that at around 7:00 a.m., his driver's side door opened. When Abiel opened his eyes, he saw Aluat moving toward him. According to Abiel, Aluat punched him and said, "I got you now, motherfucker." Aluat punched Abiel two or three times while Abiel tried to fight his way out of the car. Manon jumped in to punch Abiel with

6

his left hand, and Abiel saw a knife in his right hand.  Abiel grabbed Manon's right hand, hit it, and the knife fell to the ground.  As soon as Abiel picked up the knife, Aluat closed in on him, punching him and grabbing him by the neck.  The men were yelling and Abiel was screaming for help.  When Aluat choked him, Abiel jabbed him in the back with the knife, then jumped back and slashed at Aluat when Aluat closed in on him again.  Manon walked away, and Abiel called 911.  He testified he did not tell the 911 operator about the knife because he panicked, the incident was still fresh, and everything happened fast.

On cross-examination, Abiel admitted that he walked to a dumpster in the alley and tossed the knife in it.  He also admitted that he lied to police about using a knife and stabbing Aluat.

*Jury Instructions*

The trial court instructed the jury as to homicide and self-defense, the degrees of murder, voluntary manslaughter, and imperfect self-defense.  It also read CALCRIM No. 3471, as to mutual combat, as follows:  "A person who engages in personal[4] combat has a right to self-defense only if:  [¶]  one, he actually and in good faith tried to stop fighting;  [¶]  two, he indicated by word or by conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting;  [¶]  and, three, he gave his opponent a chance to stop fighting.  If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight; however if the defendant used only nondeadly force and the opponent

---

4    The trial court apparently misspoke when it used the word "personal."  The instruction uses the word "mutual."  The written instruction used the correct language.

7

responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop the opponent or give the opponent a chance to stop fighting.  [¶]  A fight is mutual combat when it began or continued by mutual consent or agreement.  That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

## DISCUSSION

Abiel contends the trial court erred when it instructed the jury with CALCRIM No. 3471 pertaining to mutual combat; that the instruction "effectively removed the principles of self-defense from the jury's consideration . . . ."  He advances several interrelated arguments.  Abiel contends the instruction was erroneous because it was not supported by evidence of any agreement to fight.  He further maintains that the court erred in its oral charge to the jury by using the words "personal combat," and that the court's oral instructions, and the written instruction, misstated the law.  According to Abiel, these errors separately or combined violated his right to present a defense under the California and United States Constitutions.

### I. *Forfeiture*

The People argue that Abiel has forfeited the contentions for failing to object to the court's giving of CALCRIM No. 3471.  They maintain because the instruction was correct in the law, it did not affect his substantial rights.

"Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court.

8

[Citations.] The rule of forfeiture does not apply, however, if the instruction was an incorrect statement of the law [citation], or if the instructional error affected the defendant's substantial rights." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719; see also *People v. Cleveland* (2004) 32 Cal.4th 704, 749.) If Abiel were correct in his contention (we conclude below he is not), an instruction incorrect in law would affect his substantial rights, thus not requiring an objection. (See, e.g., *Cleveland*, at p. 749; *People v. Hillhouse* (2002) 27 Cal.4th 469, 505.) In short, " ' "[a]scertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." ' " (*Franco*, at p. 719.) Because we cannot determine whether the instruction is correct in the law until we analyze it, we proceed to the merits of Abiel's claims.

## II. *Claim That CALCRIM No. 3471 Misstates the Law*

### A. *Standard of Review*

"We review de novo whether a jury instruction correctly states the law. [Citations.] Our task is to determine whether the trial court ' "fully and fairly instructed on the applicable law." [Citation.]' [Citation.] When instructions are claimed to be conflicting or ambiguous, 'we inquire whether the jury was "reasonably likely" to have construed them in a manner that violates the defendant's rights.' [Citation.] We look to the instructions as a whole and the entire record of trial, including the arguments of counsel. [Citations.] We assume that the jurors are ' " 'intelligent persons and capable of understanding and correlating all jury instructions . . . given.' " ' [Citation.] If reasonably

9

possible, we will interpret the instructions to support the judgment rather than to defeat it. [Citation.] Instructional error affects a defendant's substantial rights if the error was prejudicial under the applicable standard for determining harmless error." (*People v. Franco*, *supra*, 180 Cal.App.4th at p. 720; italics omitted; see also *People v. Bryant* (2014) 60 Cal.4th 335, 433.)

B. *Contentions*

Abiel contends CALCRIM No. 3471 does not accurately reflect the law with regard to the mutual combat exception to the right of self-defense. He argues the instruction, which he maintains has two "critical flaws," includes language that permits a finding of mutual combat even when the prearrangement, mutual consent or agreement to fight did not precede the initiation of hostility. Abiel argues the first flaw in the instruction is its language indicating a fight is mutual combat when it is *continued* by express or implied mutual consent, and not merely when the mutual consent precedes the initiation of hostilities. He argues the second flaw is that the instruction states the agreement must occur "before the claim to self-defense arose." According to Abiel, based on the evidence, the jurors could reasonably have concluded that the final confrontation between Abiel and Aluat, culminating in Aluat's stabbing, was a continuation of the fight or fights that occurred at the club and that the men's conduct evinced an implied agreement to continue the fight before Manon introduced his knife. Thus, Abiel argues, the jury would have found under the given self-defense and mutual combat instructions that the continuation of the fight preceded the moment when he reasonably feared death or great bodily injury, and he therefore "forfeited his right to self-

10

defense by the very exercise of that right because he did not first refuse to fight, communicate his peaceful intentions to Aluat and give Aluat an opportunity to desist." Abiel argues this is an "absurd" result under *People v. Ross* (2007) 155 Cal.App.4th 1033 (*Ross*).

## C. *Ross*

In *Ross*, *supra*, 155 Cal.App.4th 1033, the defendant and a woman "engaged in a hostile verbal exchange, at the culmination of which she slapped [the defendant, who] responded with a blow that fractured her cheekbone." (*Ross*, at p. 1036.) The defendant was convicted of aggravated assault and battery after the trial court instructed the jury, over defense objection, that a person charged with assault cannot successfully plead self-defense if he was engaged in mutual combat with the alleged victim. (*Id*. at p. 1042 & fn. 8.) The trial court refused the deliberating jurors' request for a legal definition of "mutual combat," telling them there was no legal definition and instead to rely on the common, everyday meaning of those words. (*Id*. at p. 1042.) The appellate court held this was error; that the phrase mutual combat was "too broad to convey the correct legal principle" and the jury was therefore "left . . . free to suppose that any exchange of blows disqualifies both participants from claiming a right of self-defense. In fact the doctrine applies only to a violent confrontation conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to fight." (*Id*. at pp. 1036, 1047, 1056.)

The *Ross* court explained: "Here the jury was told that participation in 'mutual combat' conditionally bars the participants from pleading self-defense if either is prosecuted for assaulting the other. The 'combat' element of this rule is clear enough, at

11

least for present purposes.  It suggests two (or more) persons fighting, whether by fencing with swords, having a go at fisticuffs, slashing at one another with switchblades, or facing off with six-guns on the dusty streets of fabled Dodge City." (*Ross*, *supra*, 155 Cal.App.4th at p. 1043, fn. omitted.)  The court cautioned that under the ordinary meaning of the words mutual combat, "any combat may be correctly described as 'mutual' so long as it is seen to possess a quality of reciprocity or exchange.  . . .  If A walks up to B and punches him without warning, and a fight ensues, the fight may be characterized as 'mutual combat' in the ordinary sense of those words.  But as this example demonstrates, the phrase so understood may readily describe situations in which the law plainly grants one of the combatants a right of self-defense." (*Id*. at p. 1044.)  Thus, the court observed, "the phrase 'mutual combat' is not only ambiguous but a misnomer.  The mutuality triggering the doctrine inheres not in the combat but in the *preexisting intent to engage in it.*  Old but intact caselaw confirms that as used in this state's law of self-defense, 'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities.  . . .*  'Both before and since [the 1872 enactment of Penal Code section 197] the phrase "mutual combat" has been in general use to designate the branch of the law of self-defense relating to homicides committed in the course of *a duel or other fight begun or continued by mutual consent or agreement, express or implied.*  [Citations.]'  (Italics added.)  In other words, it is not merely the *combat,* but the *preexisting intention to engage in it,* that must be mutual." (*Id.* at p. 1045, fn. omitted.)  In a footnote at this point, the *Ross* court stated: "Respondent glosses over this requirement by asserting that the doctrine requires only

12

that both parties 'want to fight.' Missing is the critical requirement that this common intention or desire must precede the first assaultive conduct, or at least the first conduct sufficient to trigger a right of self-defense in its target. If A triggers such a right in B by striking him, B does not forfeit that right merely because the blow makes him 'want to fight.' Hot blood may cause him to exercise the right unreasonably, and to that extent he will forfeit it. But his 'want[ing] to fight' does not make it a case of mutual combat." (*Id*. at p. 1045, fn. 14.) The court finally summarized: "We are satisfied that 'mutual combat' consists of fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight. The agreement need not have all the characteristics of a legally binding contract; indeed, it necessarily lacks at least one such characteristic: a lawful object. But there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*." (*Id*. at pp. 1046-1047.)

In *Ross*, the evidence was insufficient to establish any such arrangement or agreement. That is, the appellate court held the evidence showed "an exchange of belligerent comments culminating in an impulsive and unexpected blow by [the woman] to which defendant responded with a combination, flurry, or barrage of blows," and therefore no reasonable juror could conclude beyond a reasonable doubt that when the blows were exchanged, both parties had formed the intent to engage in a fight. (*Ross*, *supra*, 155 Cal.App.4th at p. 1052.) Furthermore, the appellate court concluded a properly instructed jury would have understood that the defendant was entitled to defend himself if he actually and reasonably anticipated "that a further blow—even a slap—was

13

imminent." (*Id*. at p. 1055.)  And the jury's question about the instruction suggested it misunderstood it in precisely the way the appellate court outlined, and thus misapplied it to improperly disqualify the defendant from asserting his right to defend himself.  (*Id*. at p. 1056.)  For these reasons, the court concluded the error was prejudicial.  (*Id*. at pp. 1057-1058.)

D.  *Analysis*

We agree with the People that CALCRIM No. 3471 is a legally accurate and unambiguous instruction that did not mislead the jury or require it to conclude that Abiel was somehow precluded from asserting a claim of self defense.  As the People point out, the instruction, as read to the jury, included a definition of mutual combat as a fight that "began or continued by mutual consent or agreement.  That agreement may be expressly stated or implied and must occur before the claim to self defense arose."

Under that definition and the instruction as a whole, we conclude a reasonable jury would not read it as Abiel proposes: that a person's conduct in responding in self defense may become mutual combat simply because the person exercising his self-defense right "continues" the fight by fighting back.  The instruction makes clear that there must be proof of an agreement to commence the fight or continue it if it was already in progress. Thus, the jury would not have been misled by the instruction in this manner; stated another way, there is no "reasonable likelihood that the jury misconstrued or misapplied [CALCRIM No. 3471's] words."  (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1237; see also *People v. Mayfield* (1997) 14 Cal.4th 668, 777.)  Abiel criticizes the instruction for informing the jury that the agreement must occur before the claim of self-

14

defense arose, rather than, as *Ross* assertedly requires, before the " 'initiation of hostilities.' " He maintains those are two different tests. But *Ross* does not support that assertion or restrict the inquiry to one test; as summarized above, *Ross* explains that a "critical requirement" of mutual combat is that the common intention precede "at least the first conduct sufficient to trigger a right of self-defense in its target" (*Ross*, *supra*, 155 Cal.App.4th at p. 1045, fn. 14) and the court concluded that "there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*." (*Id*. at p. 1047.) Thus, using *Ross* as a guide as Abiel does, the language of CALCRIM No. 3471 is not legally erroneous.

Nor does CALCRIM No. 3471 lead to absurd results, as Abiel maintains. In *Ross*, the absurdity arose because the trial court told the jurors to apply an everyday meaning of the phrase "mutual combat," which without further definition allowed them to conclude that "any violent struggle between two or more people, however it came into being" was a situation of mutual combat. (*Ross*, *supra*, 155 Cal.App.4th at p. 1044.) However, the instruction used in the present case, which was applied to facts entirely different from those in *Ross*, complies with the law. Abiel's self-serving version of events was that Aluat and Manon ambushed him while he was sleeping in his car, and that during Abiel's scuffle with Aluat, Manon later produced a knife, which Abiel knocked from Manon's hand, grabbed and used on Aluat, who was choking him. As the People point out, if we adopt that version of events, CALCRIM No. 3471 made clear that Abiel, who initially responded to Aluat with nondeadly force, was permitted to use deadly force when Manon

15

responded with such sudden and deadly force (i.e., producing the knife) that Abiel could not withdraw from the fight, and in those circumstances, Abiel "was not required to try to stop fighting or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting." (CALCRIM No. 3471.) If the jury was to adopt Abiel's version of events, it would not conclude, given the entirety of the jury instructions, that Abiel forfeited his right to self-defense by acting in response to Manon's production of a knife without giving Aluat an opportunity to desist. Our conclusion does not change by the fact that only one of the two men who assertedly attacked Abiel produced a knife.

Furthermore, the court instructed the jury about Abiel's right to defend himself (CALCRIM No. 505); specifically, that Abiel would act in lawful self-defense if he "reasonably believed that he was in imminent danger of being killed or suffering bodily injury or was in imminent danger of being killed or suffering great bodily injury"; he "reasonably believed that the immediate use of deadly force was necessary to defend against that danger"; and he "used no more force than was reasonably necessary to defend against that danger."[5] It further instructed that the jury could find Abiel guilty of

---

[5] That instruction, as read by the trial court, continued: "Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable, and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified. [¶] When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. The defendant's belief that

16

voluntary manslaughter based on imperfect self-defense if he had an actual but unreasonable belief in the need to use deadly force to defend himself. And, it instructed the jury with CALCRIM No. 200 that "[s]ome of these instructions may not apply depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. [¶] After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

Under all of the instructions, if the jury found mutual combat did not occur under the facts of the case, they were told to disregard the reference to mutual combat. But this did not eliminate from the jury's consideration evidence of self-defense or imperfect self-defense, on which the jury was instructed. We presume the jurors understood and were able to correlate all of the court's instructions, and that their own intelligence and expertise prevented them from relying on a factually inadequate theory. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1131 ["jurors' 'own intelligence and expertise will save them from' the error of giving them 'the option of relying upon a factually inadequate theory' "].) Accordingly, the circumstances demonstrate that the jury was in fact permitted to consider Abiel's claim of self defense under proper instructions.

he was threatened may be reasonable even if he relied on information that was not true; however, the defendant must actually and reasonably have believed that the information was true. [¶] If you find that Marko Aluat threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable. Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person." (CALCRIM No. 505.)

### III. *Sufficiency of Evidence to Support a Theory of Mutual Combat*

Abiel contends that notwithstanding his arguments as to the legal correctness of CALCRIM No. 3471, we should reverse his conviction because there was insufficient evidence an agreement to fight existed before the initiation of hostilities to warrant giving the instruction. Abiel relies on the principles that the court errs by giving an instruction that, though correct, has no application to the facts of the case (*People v. Guiton*, *supra*, 4 Cal.4th at p. 1129) and that a judgment should be reversed when a review of the record demonstrates a reasonable probability that the jury found a defendant guilty solely on the unsupported theory. (*Id*. at pp. 1129-1130.) According to Abiel, "[t]here can be no question but that the jury convicted [him] 'solely on the unsupported theory' that [he] did not act in lawful self defense"; he argues the evidence shows Manon and Aluat came to the scene of Aluat's stabbing knowing about Abiel's presence and only after Manon already had fought with Abiel and others at that location.

In making this argument, Abiel disregards evidence from which the jury could have reasonably inferred that Abiel and Aluat, who were involved in the original dispute over Aluat pushing Abiel at the club, had mutually agreed to continue the earlier altercation and fight out their differences outside Maluahi's apartment. Though Abiel and Wiir had scuffled outside of the club, Wiir and Aluat were best friends, and according to Manon, Aluat offered to insert himself back into the situation when Manon expressed his interest in returning to Maluahi's house. By that time, Manon was aware that Abiel did not have his car keys, and could not leave the area. Koopman, who was a neutral witness, saw a group of men yelling at each other early that morning, and several hours

18

later heard the second altercation among the men in which Abiel advanced on Aluat, who was backing up before he fell to the ground. Koopman's testimony, which Abiel disregards in his analysis, supports a theory that Abiel was at least equally engaged, if not the aggressor, in the fight with Aluat and not merely defending himself. Though the inference to be drawn is a slim one, it is not unreasonable to infer the men fought the second time at Maluahi's apartment by prearranged mutual intention or consent. Under the circumstances, there was sufficient evidence to support the giving of CALCRIM No. 3471 as to mutual combat.

## IV. *Claim of Error in Court's Oral Instruction*

Abiel contends that the trial court's error in using the phrase "personal combat" instead of the phrase "mutual combat" in its oral reading of CALCRIM No. 3471 requires reversal of his conviction. Abiel acknowledges that the written instruction was correct, and that those written instructions control when there is a discrepancy between the written instruction and the court's oral charge. (See *People v. Wilson* (2008) 44 Cal.4th 758, 803 ["To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control."].) Abiel also acknowledges that a claim of jury misinstruction requires that we assess the instructions as a whole, viewing the challenged instruction in context with the other instructions so as to determine whether there is a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*Ibid*.) He maintains it is reasonably likely the jury applied the instructions in an impermissible manner, and the "net effect of that error

19

was the removal of [his] ability to assert self-defense and the denial of [his] right to a jury determination of every material fact."

Abiel does not explain with any detail how the jury would have misapplied CALJIC No. 3471 based on the court's use of the word "personal " rather than "mutual." Nor does he explain how the court's misinstruction implicated his "substantial rights" (§ 1259) so as to permit this court to consider it without his objection below. Abiel merely argues that CALCRIM No. 3471 is the only instruction that addresses the preclusion of self-defense in situations of mutual combat, and the only other related instruction was CALCRIM No. 505, as to lawful self-defense. None of these arguments convince us that jurors somehow misinterpreted CALCRIM No. 3471, or the principles of mutual combat, based on the court's misspeaking and using the phrase "personal combat." Our review of the instruction as a whole shows that the jury was provided a correct definition of "mutual combat." It is not reasonably likely they reached some misunderstanding of these principles by the fact that the court misspoke.

In *People v. Mills* (2010) 48 Cal.4th 158, our high court rejected a similar claim with reasoning that applies equally in this case: "The risk of a discrepancy between the orally delivered and the written instructions exists in every trial, and verdicts are not undermined by the mere fact the trial court misspoke. 'We of course presume "that jurors understand and follow the court's instructions." [Citation.] This presumption includes the written instructions. [Citation.] To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.' [Citation.] Because the jury was given the correctly worded instructions in

written form and instructed . . . that '[y]ou are to be governed only by the instruction in its final wording,' and because on appeal we give precedence to the written instructions, we find no reversible error." (*People v. Mills*, at pp. 200-201.) Here, the court instructed the jury similarly with CALCRIM No. 200, telling the jurors that it would give them a copy of the instruction that may be printed, typed or written, and they were to "[o]nly consider the final version of the instructions in your deliberations." We conclude, as in *Mills*, the court here did not commit reversible error, structural or otherwise.

## V. *Claim of Cumulative Error*

Finally, Abiel contends that even if none of the aforementioned errors warrant reversing his conviction, this court should consider that result after assessing them cumulatively. "The concept of finding prejudice in cumulative effect, of course, is not new. Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Under some circumstances, several errors that are each harmless on their own should be viewed as prejudicial when considered together. (*People v. Hill* (1998) 17 Cal.4th 800, 844.) We have found no merit to Abiel's claims of error, thus his cumulative error argument fails. No serious errors occurred that, viewed individually or in combination, could possibly have affected the jury's verdict. (*People v. Martinez* (2003) 31 Cal.4th 673, 704; *People v. Valdez* (2004) 32 Cal.4th 73, 128.) Absent error in any respect, Abiel's claim of cumulative prejudicial error must be rejected. (*People v. Butler* (2009) 46 Cal.4th 847, 885.)

DISPOSITION

The judgment is affirmed.


                                                                O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.